**UNITED STATES of America,**
**Plaintiff,**

**v.**

**The PEELLE COMPANY, Henry E. Peelle, Inez Beatty Peelle, Richmond Fireproof Door Company, Multiscope, Inc., Quinta Company, Inc., Robert B. Peelle, Individually and as Conservator of the Estate of Henry E. Peelle, John W. Peelle, Margaret W. Peelle, Chase National Bank of New York, Trustee, Prudential Savings Bank, City of New York, Yates County, New York, Defendants.**

**Civ. No. 15192.**

United States District Court
E. D. New York.

March 30, 1955.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., Richard C. Packard, Brooklyn, N. Y., and Robert J. Grimmig, E. Rockaway, Asst. U. S. Attys., and Homer R. Miller, Special Asst. to the Atty. Gen., of counsel, for plaintiff.

Blaisdell & Dunne, New York City, for Peelle Co.

Parker, Chapin & Flattau, New York City, for Robert B. Peelle and Henry E. Peelle, Jr.

Leve, Hecht, Hadfield & McAlpin, New York City, for John W. Peelle and Margaret W. Peelle.

ABRUZZO, District Judge.

This action was filed pursuant to Section 7403 of the Internal Revenue Code of 1954, 26 U.S.C.A., for the foreclosure of liens for income and excess profits taxes against the defendants as follows:

| Name | Nature of Tax | Years | Amount |
|---|---|---|---|
| (a) The Peelle Company | Income and excess profits | 1945–1949 | $1,130,106.54 |
| (b) Henry E. Peelle | Income | 1944–1947 | $757,514.98 |
| (c) Inez Beatty Peelle, Transferee of Henry E. Peelle | Income | 1944–1947 | $757,514.98 |
| (d) Henry E. Peelle and Inez Beatty Peelle | Income | 1948 and 1949 | $826,341.06 |

A complaint was filed against these defendants for these sums and subsequent to the filing of the complaint this Court appointed a temporary receiver in equity for the defendant, The Peelle Company, as provided in Section 7403(d), Internal Revenue Code of 1954.

After the appointment of the temporary receiver, he appointed by order of this Court his own attorney and proceeded to take charge of the assets of this corporation and administer its business. He found upon entering his duties that most of the stock of The Peelle Company was owned by the Peelle family and that The Peelle Company owned practically all of the stock of the Richmond Fireproof Door Company. As yet, the receiver has not obtained control of the Richmond Fireproof Door Company which is a separate and distinct corporation in Indiana and, therefore, the assets of the Richmond Fireproof Door Company are not within the control of the temporary receiver.

The complaint and the affidavits which requested the appointment of a temporary receiver alleged that the Internal Revenue Department had made a jeopardy assessment under Section 6861 (a), Internal Revenue Code of 1954, against The Peelle Company. This jeopardy assessment has the force of a judgment. Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421; Citizens Nat. Trust & Savings Bank of Los Angeles v. United States, 9 Cir., 135 F.2d 527, 528.

The Peelle Company has not executed and filed a bond to stay the collection of these taxes so assessed, nor has it paid them. Many affidavits have been filed by both sides and the question to be determined, based upon the complaint, the affidavits and the assessment, is whether or not this temporary receiver should be made permanent.

At the outset, it is pertinent for the Court to state that all parties were afforded an opportunity to file any affidavits germane to the issue, together with answering affidavits, up to and including March 8, 1955. This time was necessarily extended because of the fact that John W. Peelle, one of the defendants and a stockholder controlling the vote of 42 per cent of The Peelle Company, was in jail serving a sentence for tax fraud and he was given until March 14, 1955, to file affidavits. He was released from prison either the 13th or 14th of March.

The Peelle Company is the owner of a plant and equipment located in Brooklyn, within the jurisdiction of this Court, and owns all of the stock of the Richmond Fireproof Door Company and probably all the stock of Multiscope, Inc., and Quinta Company, Inc., Richmond, Indiana, other defendants named but not as yet served. The complaint alleges and the affidavits in support of the motion for a temporary receiver set forth that it

was necessary to appoint a receiver to prevent The Peelle Company from wasting, dissipating, selling, marketing or otherwise disposing of or removing its property and assets so as to prevent the United States from enforcing its liens, and to conserve and preserve its properties for the benefit of the stockholders. The complaint and affidavits presented in support of the appointment of a temporary receiver alleged that the properties of The Peelle Company have been wasted and dissipated and transferred without consideration, and that the business of The Peelle Company would continue to be operated at a loss under the present management. This would result in a loss of the plaintiff's lien. At the time the temporary receiver was appointed, an order was issued directing the defendant, The Peelle Company, to show cause why the temporary receiver should not be made permanent.

A certificate of the Commissioner provided for in Section 7403(a), Internal Revenue Code of 1954, was duly filed before the temporary receiver was appointed and stated in effect that it was in the public interest that a receiver be appointed with all the powers of a receiver in equity. Subsequent to the appointment of the temporary receiver, The Peelle Company filed a petition with the Circuit Court of Appeals for the Second Circuit for a stay which was denied by that Court from the bench.

In support of this motion for a permanent receiver, many affidavits were filed by the plaintiff. It is my province to attempt to evaluate these affidavits. In opposition to this motion there were many affidavits filed by the defendants. I will attempt to summarize the salient facts in these affidavits. Counsel for both sides were requested to submit briefs. Both sides have done so.

The following are some of the facts alleged in the affidavits in support of the motion for a permanent receiver.

Robert H. Shelly, as Special Agent of the Bureau of Internal Revenue, was assigned to investigate the tax returns of The Peelle Company, Henry E. Peelle, Inez Beatty Peelle and the Richmond Fireproof Door Company. In his investigation he discovered that Henry E. Peelle maintained three bank accounts in the name of The Peelle Company; none of these accounts being reflected on the corporate books. From 1945 to 1949 he deposited in these three corporate accounts approximately $687,000. He withdrew this money from these corporate bank accounts as his personal needs dictated. In these same years, The Peelle Company leased to the Hilo Varnish Corporation property located at No. 42 Stewart Avenue, Brooklyn, New York. Checks amounting to $130,000 in payment of rent and taxes for this property were deposited in these three secret bank accounts and not reflected as income on the corporate books. There were many items of personal expenses of Henry E. Peelle carried on the corporate books as "national sales expense." Under this heading personal insurance premiums of Henry E. Peelle, Jr., were paid out. From 1945 to 1949, John W. Peelle, treasurer, charged and paid for improvements of private property in the amount of $2,500 which was carried on the books as "erection expenses." In the years 1948 and 1949 The Peelle Company devaluated by 50 per cent a $333,000 physical material inventory and reported for corporate tax purposes the devalued inventory figure of $166,500.

In his affidavit, Daniel J. Maher, Special Agent of the Intelligence Division, Internal Revenue Service, alleges that The Peelle Company in 1949 bought all of the stock of Multiscope, Inc., a Kansas corporation, at a price of $568 per share, totaling $650,000, of which $115,000 was paid as the initial payment. He further discovered that many checks were drawn by Henry E. Peelle to the order of fictitious organizations, ostensibly creditors of The Peelle Company. At some later time these checks were destroyed and a single check in an amount equal to the aggregate of the destroyed checks was issued to Henry E. Peelle and deposited by him in one of the secret bank accounts related in Special Agent Shelly's affi-

davit. Some of this money found its way in the Boulevard Bank of Forest Hills, New York, of which he was a director. The amount of this aggregate check was then charged off as an expense on The Peelle Company's books.

Maher sets forth in his affidavit that an indictment was found by a Grand Jury in this District against Henry E. Peelle for an evaded tax liability exceeding $850,000. The indictment was based upon the diversions of corporate income by Henry E. Peelle, the charging as expense corporate funds applied to the personal use and benefit of Henry E. Peelle, arbitrary devaluation of corporate inventory, and the charging as corporate expense the purchase of the stock of Multiscope, Inc. Henry E. Peelle is now confined in a mental institution in the State of Florida.

John W. Peelle was also indicted for tax evasion, pleaded guilty and was sentenced to a term in prison.

Henry E. Peelle, the incompetent, at some time, but it does not appear precisely when, transferred his majority stockholdings in The Peelle Company equally to his two sons, Robert B. Peelle and Henry E. Peelle, Jr. In 1950 Henry E. Peelle resigned as president and his two sons, Henry E. Peelle, Jr., then at the age of 28, and Robert B. Peelle, 33, assumed the control and management of The Peelle Company as president and vice president, respectively. The Peelle Company owns practically all of the stock of the Richmond Fireproof Door Company in Indiana and Henry E. Peelle, Jr., and Robert B. Peelle, through their stock control of The Peelle Company, in turn fully control the Richmond Company. The Government has filed and there now is in existence a jeopardy assessment against the Richmond Company in the amount of $333,960.91.

Sidney A. Kaplan, a Certified Public Accountant, immediately after the temporary receiver was appointed, examined the books and records of both the Richmond Fireproof Door Company and The Peelle Company. As of January 31, 1955, he found the books of The Peelle Company in disorder, not having been posted since September 30, 1954. From this disorganized system of bookkeeping he was able to make a calculated balance sheet. This balance sheet indicates that the Peelle Company does not have sufficient liquid assets at this time to pay the tax lien. The company would not be able to do so for a long time.

From an examination of the Richmond Company books he made the discovery that from approximately November 1, 1946, to December 31, 1954, promissory notes were issued to the Peelle family in the amount of $340,928.76. The books reflected no consideration for their issuance. The Richmond Company obtained a tax refund of $62,416.53 with respect to its 1951 income tax return, the books being void of any record of this refund.

Henry E. Peelle was reported to have transferred to The Peelle Company on or about August 11, 1950, assets of the value of $857,264.65. Of this amount, $158,238.73 represented the cancellation of notes which could not be found on the books. Of the amount of $857,264.65, $306,953.35 according to the report of George S. Olive & Co., Certified Public Accountants, was paid in cash. The books do not record that $195,668.38 of this amount was received by The Peelle Company.

The Richmond Company books showed a commingling of social security taxes with corporate funds.

As to the shares of stock of Multiscope, Inc., $350,000 was paid on account to Multiscope, Inc. On December 16, 1952, The Peelle Company sold 364 shares of Multiscope, Inc., to Quinta Company, Inc., for $36,400 as evidenced by a promissory note in that sum due and payable December 1, 1953. The note was paid. The shares of stock were sold at $100 per share, whereas The Peelle Company had paid approximately $568 per share. The Quinta Company, Inc., it is believed, is owned by Inez Beatty Peelle, the wife of Henry E. Peelle, the incompetent, and the mother of Henry E. Peelle, Jr., and Robert B. Peelle.

The affidavit of Joseph F. Ruggieri indicates that he is qualified to operate the Peelle plant, has given much of his time and has thoroughly investigated its corporate status, financial condition, business operation, personnel and contractual obligations and intercorporate associations of the defendants and The Peelle Company. Since his appointment as temporary receiver, the real management of the company has not been disturbed and all of the key personnel have remained with the company. During the first 11 days of the temporary receiver, the sales of the Richmond Company amounted to $150,934.41, while in a comparable period of 1954 the sales amounted to $114,293.06. The cash position of The Peelle Company, since the temporary receiver, has improved from the sum of $222,747.48 to $318,711.40 as of February 15, 1955. From time to time The Peelle Company is required to give performance bonds on stairway contracts. Mr. Ruggieri in his affidavit states that the Aetna Casualty and Surety Company, from whom Peelle got all of its performance bonds, would continue to issue such performance bonds to him as receiver just as it would to The Peelle Company provided the balance sheet of The Peelle Company so warranted. Mr. Ruggieri further states that the Royal Indemnity Company and the Fidelity & Deposit Company would likewise issue performance bonds under like circumstances.

In his affidavit, John W. Peelle who, it will be noted, owns or controls 42 per cent of the stock, does not oppose the appointment of a permanent receiver. To his affidavit he attached the minutes of the Annual Meeting of Stockholders of The Peelle Company on June 7, 1954. This meeting was conducted by Henry E. Peelle, Jr., as president. From these minutes it develops that there are 750 shares of common stock and 750 shares of preferred stock (p. 14). John W. Peelle owns 267 common and 206 preferred; Henry E. Peelle, Jr., 240 common, 157 preferred; Robert B. Peelle, 239 common, 158 preferred. They are the largest stockholders. A perusal of the 96 pages of the minutes of that meeting developed without doubt that the members of the Peelle family are at odds. The majority stockholders intend to run the company to the exclusion of the minority stockholders. The minutes indicate that President Peelle announced an operating loss of The Peelle Company of some $300,000 for the year 1953 (pp. 18–30). No certified audit was available at the meeting. John W. Peelle stated that there was an operating loss of $118,000 according to the auditor, Miss Phelps, of the Richmond Company for the year 1953 (p. 90).

Only the most important allegations have been covered.

In the brief submitted by all of the attorneys in opposition to the appointment of a permanent receiver, they stress two points only:

### Point I

*That the appointment of a permanent receiver is a harsh and drastic remedy.*

### Point II

*That there is no compelling necessity for the appointment of a permanent receiver in view of the facts set forth in opposition to this appointment.* (Italics supplied.)

The following are some of the facts alleged in the affidavits in opposition to a permanent receiver.

The affidavit of Henry E. Peelle, Jr., indicates he first became associated with The Peelle Company in 1948 and was made the president in 1950. He and his brother obtained effective control of the company in 1952. He denies any dissipation of assets. As to what transpired prior to 1950 he relies upon the affidavit of J. J. van Benten, a Certified Public Accountant associated with the firm of George S. Olive & Company, accountants. Henry E. Peelle, Jr., does not deny there is a very substantial tax liability, but he contends that there are

sufficient assets to pay all Government taxes.

In his affidavit he set forth that he made an offer to the District Director to pay the sum of $400,000 on account of the taxes owed by The Peelle Company and the Richmond Company. This payment was to be made by a sum in cash and the balance in current accounts payable. (Note: These are corporate assets now possessed by the temporary receiver.) The balance of this large tax he has offered to pay by allotting 60 per cent of the combined profits of The Peelle Company and the Richmond Company after taxes each year, but in no event not less than $100,000 per year until the Government tax is fully taken care of. This offer was made conditionally. If the Government accepted the offer as aforesaid the jeopardy tax should be abated. (Note: The Government would necessarily yield and waive the fraud penalty. A sizable tax would, therefore, be lost by the Government.)

J. J. van Benten in his affidavit states that he is a Certified Public Accountant in the State of Indiana and is associated with the firm of George S. Olive & Company, Certified Public Accountants. This firm on August 17, 1950, became the accountants for the Richmond Company and made an audit of that company for the years 1951, 1952, 1953 and part of 1954. In February, 1951, that firm was engaged to audit the books of The Peelle Company. In his affidavit he states that no promissory notes of any kind, character or description were ever issued to a member of the Peelle family, or others, without full consideration in money or money's worth. (Note: His affidavit does not state what the consideration was, nor does it give a history of the complexity of the Richmond Company and The Peelle Company notes.)

In his affidavit he maintains that The Peelle Company had returned to it assets in the value of $857,264.65 from Henry E. Peelle. With respect to this item, at page 5 of his affidavit I find a listing of how only $330,403.81 was returned. With respect to the 364 shares of Multiscope, Inc., sold to Quinta Company, Inc., he states that the sale was made in an effort to convert a paper loss into a real tax loss for the purpose of off-setting realized capital gains upon the sale of other assets (p. 7). (Note: I find nothing in his affidavit with respect to setting up reserves for the payment of these past taxes of either The Peelle Company or the Richmond Company.)

The affidavit of Robert B. Peelle is similarly in effect to that of his brother. He filed a supplemental affidavit, sworn to the 14th day of March, 1955, in which he states unequivocally that in 1954 The Peelle Company will show a net profit after depreciation of $225,000. (Note: This is a conclusive statement and not as yet borne out by the books. Neither of the accountants bears out this statement.)

These affidavits do not substantiate the position that the receiver should not be made permanent. They lend proof to the necessity of a permanent receiver. The affidavit of van Benten is vague as to the return of $857,264.65 admittedly taken from The Peelle Company. He accounts for the return of $330,403.81. The sale of the Multiscope stock to Inez Beatty Peelle, who still is the owner of the stock sold at a tremendous loss, was for the purpose of converting a paper loss into a stock loss. These two deals caused a diminution of Peelle assets and seriously affected the Government's tax lien. The taxes were due and owing when these transactions took place. Taken in conjunction with other facts contained in the affidavits of the Government, some not denied by the defendants, others not explained, the sum total of the facts before me do not support The Peelle Company's contentions contained in Points I and II.

### Summary

■ (1) It is not disputed that there is a jeopardy assessment of $1,130,106.54 against The Peelle Company and $333,960.91 against the Richmond Company.

It has not been paid nor bonded, and the offer of $400,000 in cash and accounts receivable and $100,000 per year for an abatement of the fraud penalty indicates clearly that the Government is owed a very substantial part of the tax assessed. Neither company has sufficient assets to make payment and a forced sale would in effect be destructive to the Government's lien.

(2) There has been no explanation made of the more than $600,000 put by Henry E. Peelle into secret bank accounts not under the control of the company, nor of the $130,000 rent. These amounts were corporate assets. These items have reduced the assets of The Peelle Company, in turn affecting the collectivity of the tax assessed against that company.

(3) It is impossible to follow the family note transactions between these two companies. Any vacation of this receivership might result in a payment of notes to the Peelle family which would be detrimental to the Government's lien.

(4) The Multiscope transactions inured to the benefit of the wife of Henry E. Peelle, the incompetent, and the assets of The Peelle Company were greatly reduced.

(5) It is claimed that $850,000 was returned to The Peelle Company by Henry E. Peelle. As I have pointed out, a great portion of this cannot be found on the books of The Peelle Company. Suffice it to say at this time that the claimed return of this money is indicative that Henry E. Peelle took corporate assets which did not belong to him and rightfully were the assets of The Peelle Company.

(6) Henry E. Peelle, Jr., is the president of the company and received a very large salary until the appointment of the temporary receiver. He knew as president that there was a sizable tax due the Government. He knew, too, that he controlled 58 per cent of the stock and 42 per cent was controlled by others not friendly to him. As president he did nothing with respect to summary (2), the $600,000 that found its way into secret bank accounts under his father's control. With respect to summary (4), the Multiscope transactions, it is evident that this stock was sold to his mother at a tremendous loss. It was his duty to do something toward reclaiming this valuable stock. With respect to summary (5) it was his duty to see that the $800,000 was returned by his father, Henry E. Peelle, to the Company. I have attempted to point out only a few of the more important matters which indicate inactivity on his part, undoubtedly because of the relationship of father and son and mother and son.

(7) The receiver is qualified. He has not disturbed the management or personnel of the organization. The business since his appointment has not suffered one iota. With wider powers as a permanent receiver he can and will effect savings in the operation of the plant. He will protect the huge tax lien assessed and in due time pay it. This will be beneficial to the stockholders.

### Law

In United States v. Kensington Shipyard & Drydock Corp., 3 Cir., 169 F.2d 9, 12, a receiver was appointed to enforce a tax lien of the United States for over $2,000,000 against the defendant. His appointment was upheld.

In United States v. Pettyjohn, D.C. W.D.Mo., 84 F.Supp. 423, a receiver with full powers in equity was appointed in a tax lien case. He was clothed with all of the powers of a receiver in equity as is well understood in equity jurisprudence.

In United States v. Feazel, D.C.W.D. La., 49 F.Supp. 679, a receiver was appointed pursuant to a jeopardy tax assessment.

In United States v. Lias, D.C.N.D. W.Va., 103 F.Supp. 341, a receiver was appointed pursuant to a foreclosure of a lien for income taxes. His appointment was affirmed, 4 Cir., 196 F.2d 90,

In Bull v. United States, 295 U.S. 247, at page 259, 55 S.Ct. 695, at page 699, 79 L.Ed. 1421, the following language appears:

"But taxes are the lifeblood of government, and their prompt and certain availability an imperious need. Time out of mind, therefore, the sovereign has resorted to more drastic means of collection. The assessment is given the force of a judgment, and if the amount assessed is not paid when due, administrative officials may seize the debtor's property to satisfy the debt."

I have looked at the cases cited by the defendants. Johnson v. Manhattan Ry. Co., 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331; Maxwell v. Enterprise Wall Paper Mfg. Co., 3 Cir., 131 F.2d 400; Skirvin v. Mesta, 10 Cir., 141 F.2d 668. These cases did not involve tax statutes.

This receivership is in accordance with federal statutes, supra. These statutes and the decisions cited provide for the appointment of just such a receiver.

The defendants have cited United States v. Costello, D.C.S.D.N.Y., decided April 6, 1953, but the facts of that proceeding do not apply to the instant case. An application was made for a receiver in a tax case based entirely on speculation. It was the contention of the Government in that case that they were entitled to the appointment of a receiver but apparently it was denied on the ground that the receiver after his appointment was required "to locate" assets. The court ruled that was hardly realistic as a receiver would have no greater competence for that task than the investigative forces of the Government.

After a review of all the facts contained in the affidavits, the tax statutes involved, and the cases cited, a permanent receiver should be appointed.

An order in accordance with this decision may be entered.