West Virginia Tractor & Equipment Company v. Commissioner.
West Virginia Tractor & Equip. Co. v. Commissioner
Docket No. 37517.
United States Tax Court
1953 Tax Ct. Memo LEXIS 8; 12 T.C.M. (CCH) 1476; T.C.M. (RIA) 54016; December 31, 1953
*8 Petitioner's two principal stockholders had a legitimate business purpose in taking title to property which later was used by petitioner in the conduct of its business, and in leasing it to the petitioner in 1940 under a percentage lease for 10 years. The provisions of the lease for determining the rental were fair and were in conformity with the prevailing occupancy costs for similar properties in 1940. The lease was entered into in an arm's-length transaction. Held, that the amounts of rent paid by petitioner under the lease in 1947, 1948, and 1949 were required to be paid by the petitioner as a condition to the continued use of the premises, were ordinary and necessary business expense, and are deductible in full under Sec. 23(a)(1)(A). Dean P. Kimball, Esq., and Robert H. C. Kay, Esq., for the petitioner. Paul E. Waring, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax for the years 1947, 1948, and 1949, in the amounts of $18,042.56, $22,593.41, and $16,422.21, respectively. The only issue for decision is whether the amounts paid by petitioner as rent under *9 a percentage lease which was executed in 1940 represented true rent, deductible in full as ordinary and necessary business expense, in each of the taxable years under section 23 (a)(1)(A). The Commissioner disallowed deduction in each year of part of the sum paid as rent upon his determination that part of the amount was excessive. The petitioner does not contest other adjustments. The petitioner's returns for the years involved were filed with the collector for the district of West Virginia. Findings of Fact The facts which have been stipulated are found as facts. The stipulation is incorporated herein by this reference. The petitioner, a West Virginia corporation, was incorporated on March 18, 1936. It commenced business on April 1, 1936. The outstanding stock upon petitioner's incorporation was as follows: Stockholders
Common
Preferred
L. C. Basham
450 shares
None
L. W. Sydnor
450 shares
None
Thomas Bailey
100 shares
None
Eva Sydnor
None
250 The par value of the preferred and common stock was $100 per share. The business of petitioner has always been, primarily, the selling, servicing, and repairing of heavy construction, earth moving *10 equipment such as tractors, shovels, scrapers, bulldozers and attachments, and related types of equipment. It also sold secondhand equipment received in trade-ins. From 1936 until 1939, petitioner's office was in a garage building in Charleston, West Virginia, which had a small storage lot adjoining. In 1939, the building was destroyed by fire. Thereafter, until July 1941, petitioner's personnel, merchandise, and equipment was located in various places in Charleston. On March 18, 1936, the petitioner obtained a franchise from the Caterpillar Tractor Company as its distributor of tractors and allied equipment. Under the franchise petitioner purchased from Caterpillar Tractor, tractors and allied products, which when disposed of, represented from 50 to 60 per cent of petitioner's sales. The distributor's agreement had no fixed duration. Petitioner's sales territory was the State of West Virginia. The agreement contained the following cancellation clause: "Either party may at any time terminate this agreement by written notice of its election so to do, enclosed in a stamped and sealed envelope, deposited in the Post Office, addressed to the other party at the address of such party *11 given at the end of this agreement, and upon such deposit this agreement shall be at an end." Petitioner's contract with Caterpillar Tractor which was in effect during the years 1947, 1948, and 1949 was the same contract as that which was entered into in 1936 except as to a small geographical change of territory. The contract was the standard form of contract executed by Caterpillar Tractor with each of its distributors. During the years 1947, 1948, and 1949, Caterpillar Tractor also sold to petitioner, in addition to the standard items mentioned above, items manufactured by other companies such as power winches, bulldozer blades, scrapers, hauling wagons and crane attachments, all of which items can be attached to the basic tractors. These items represented an additional 15 per cent of the petitioner's volume of sales. Petitioner also sold pumps and root rakes and stumpers purchased from other manufacturers. During the years 1940, 1947, 1948, and 1949, the petitioner was also a distributor for the Northwestern Engineering Company, Hubert Manufacturing Company, Athey Company, Michigan Power and Shovel Company, and Gardner-Denver Company. The distributor's contract with these *12 corporations did not contain a cancellation clause similar to that contained in the Caterpillar Tractor Company contract, but did contain a 30 to 60 day cancellation clause. The selling price of the large tractor was about $9,800 in 1940, and between 15 and 17 thousand dollars in 1947. A large tractor plus the blade and cable control weighs about 46,000 pounds. Smaller tractors weigh around 33,000 pounds. In 1940, the over-all height of a tractor with the largest attachment was 10 feet. The over-all height of shovels with cab ranged from 10 to 100 feet; the height was more if the shovel was equipped with a boom. In 1940, more than 95 per cent of petitioner's business consisted of sales. It occasionally leased equipment to customers. In 1940, practically all of petitioner's business was carried on with road and highway contractors. A small amount of business was done with lumber and industrial concerns. This was true during the years 1936-1940. At the beginning of the war, in March, 1942, priority regulations of the Government froze almost all equipment and the Government purchased, at times, about 100 per cent of tractor production. In 1942, the mining of coal by stripping with *13 shovels and heavy equipment increased greatly and petitioner's business was devoted in 1942 and thereafter almost entirely to selling to coal strippers. Sales by petitioner to coal strippers increased to a very large volume in 1947, 1948, and 1949, and were larger than in 1942-1945. Due to the shortage of manpower in the coal mining industry during the war, and because more coal could be mined with power equipment in surface, or strip, mining than in underground mining, the Government released heavy equipment for strip mining of coal. In 1940 and before, Caterpillar Tractor Company advised petitioner to locate its several places of business in one building. Consideration was given to constructing a new building for petitioner's business. If petitioner had constructed a building it would have had to borrow money. However, its credit at Charleston National Bank was fully utilized and Caterpillar Tractor and other suppliers took the view that petitioner should not mortgage its assets and extend its credit further in order to construct a building. After the fire, and on July 31, 1939, L. C. Basham and L. W. Sydnor purchased 250 feet of land running parallel with Patrick Street along *14 Fifth Avenue for $15,000. An option was then taken by them on the entire block and on September 5, 1940, they purchased an additional strip 61 feet in width running parallel to Patrick Street, adjoining the property previously purchased. On February 5, 1941, L. W. Sydnor and L. C. Basham purchased the balance of the entire block. These two last tracts cost $15,000. The total cost of the land was $30,000. The whole of this property is bounded 207.86 feet on Patrick Street, 466.37 feet on New York Central Railroad, 296.05 feet on Oregon Street and 468.38 feet on Fifth Avenue and contains 1.472 acres. Basham and Sydnor borrowed $25,000 from Kanawha Banking and Trust Company in 1940, and they obtained another loan of $25,000 from the Charleston National Bank for the purpose of constructing a building on the land purchased by them which would be suitable for petitioner's business. The loans were evidenced by notes of Basham and Sydnor. These loans were secured by a deed of trust dated September 5, 1940, on the real estate of Basham and Sydnor, and by assignment in trust of the rents to be received for the building. Later both banks sold and assigned the notes evidencing the loans to T. *15 A. Dietz, Sydnor's father-in-law, and Basham and Sydnor made payments on the notes to Dietz and, later, to his estate. Payments on the notes were completed in July, 1944. The building was completed in June, 1941, at a cost of $63,442. It is of steel, brick and glass construction and is 200 feet long, 100 feet wide with an offset which projects 25 feet to the rear with a length of 85 feet. It is semi-fireproof. The height of the building is 22 feet in front and slopes to the rear to 20 feet and contains a ramp. The partitions to the office are of wood. The floors are of reinforced concrete, eight inches thick, with an inch of metal cuttings at the top. The building contains a craneway and a monorail. There is a showroom on the front of the building, which occupies 4,000 square feet of floor space. Immediately back of the showroom is an office containing 2,400 square feet of space on the ground floor and 2,400 feet on the second floor. To the rear and to the right of the showroom is the parts office in which the Parts Department records are kept and a counter over which parts are delivered to customers; and immediately back of the counter, there is a room devoted entirely to the storing *16 of parts, all of which contains approximately 3,800 square feet of floor space. To the rear of the building is warehouse space and a shipping area containing 12,000 square feet. The entire square footage of the building is in excess of 23,000 square feet. The office section measures 101 feet by 44 feet. The garage is 160 feet by 100 feet. The wing to the west measures 25 feet by 85 feet. The cubic foot content of the building is 484,000 cubic feet. The building is located next to the tracks of the New York Central Railroad. There is a railroad siding from these tracks running into the property. The building is adaptable to the sale of heavy equipment and automobiles, and it is located in the heavy equipment section of Charleston. On September 11, 1940, petitioner, as lessee, entered into a lease, relating to the land and building, with Basham and Sydnor and their respective wives, as lessors, which provided in part: * * *
"(8) Lessors expressly reserve a rental for the leased premises of one and one-half per cent (1 1/2%) of the gross sales of Lessee, payable monthly in advance, based on the gross sales of Lessee for the preceding calendar month, provided, however, that *17 at no time shall such monthly rental be less than the sum of Six Hundred Dollars ($600.00) per month, which is expressly understood and agreed to be a minimum rental, the first payment of such rental to begin on January 1, 1941, and on the first day of each successive month thereafter, except that during the construction of the building herein contemplated, Lessee shall pay a rental of Three Hundred Dollars ($300.00) on the first day of October, 1940, a rental of Four Hundred Dollars ($400.00) on the first day of November, 1940, and a rental of Five Hundred Dollars ($500.00) on the first day of December, 1940, for such months, respectively; * * *
"(11) As hereinbefore provided, this lease shall be for a term of ten (10) years, and the term hereof shall be non-terminable by Lessee; Lessee, however, shall have the exclusive right and option to renew this lease for an additional term of ten (10) years upon the giving of six (6) months' written notice of such intention to Lessors prior to the expiration of the term herein created; such renewal to be upon the same terms and conditions as provided in this lease." * * *
This lease was prepared by Charles C. Wise, Jr., attorney *18 for the Charleston National Bank. The rental to be charged for the use of the building by petitioner was discussed by Basham and Sydnor with Mr. Henkel, Mr. Lowenstein and Mr. Preston Wilson, all of the Charleston National Bank; and with Mr. Galvin and Mr. McBrian, sales manager and treasurer, respectively, of Caterpillar Tractor Company. In discussing the matter of the rent to be charged for the building when the lease was being prepared, Basham informed the abovenamed persons about petitioner's volume of gross sales in the past, and he described the type, location, and purpose of the building. McBrian advised Basham that a rental based on 1 1/2 per cent of gross sales would be a reasonable and good rental. The rate for fixing the rental which was put in the lease, 1 1/2 per cent of gross sales, was arrived at through the discussions with the abovenamed persons. On September 11, 1940, petitioner's directors, Sydnor, Basham, and Bailey authorized petitioner's execution of the lease. On June 30, 1940, the stockholders of petitioner, the number of shares, and the class of stock owned by each were as follows: Stockholder
Common
Preferred
T. F. Bailey
100
L. W. Sydnor
20
50
Pearl R. Basham
300
L. C. Basham
400
Eva D. Sydnor
680
266 2/3
T. A. Dietz
183 1/3
1,500
500
*19 In 1942, Thomas F. Bailey died and his 100 shares of petitioner's stock were purchased by Basham and Sydnor on a 50-50 basis for $150 per share, or $15,000. In May, 1943, Dietz died and his 183 1/3 shares of preferred stock were purchased by petitioner at par, and cancelled. After the deaths of Bailey and Dietz, and during 1943, Sydnor and his wife, Eva, and Basham and his son, Calvin, were the sole stockholders of petitioner. The gross sales of petitioner from the time it began business on April 1, 1936 through August 31, 1940, and 1 1/2 per cent of the gross sales in each period were as follows: 1 1/2% of
Period
Gross Sales
Gross Sales
4/1 to 12/31/36
$ 633,487
$ 9,502
1937
815,016
12,225
1938
664,676
9,970
1939
977,355
14,660
1/1 to 8/31/40
792,448
11,886
Total
$3,882,983
$58,244
5 Year Average
$ 776,596
$11,648
Pursuant to the terms of the lease, petitioner, during 1941 through 1944, paid rentals as is shown in the following schedule which also shows petitioner's gross sales: Rent 1 1/2% of
Year
Gross Sales
Gross Sales
1941
$2,064,052.60
$31,416.51
1942
1,684,505.33
26,306.30
1943
1,135,063.43
18,990.67
1944
1,620,566.11
23,631.37
*20 During the taxable year 1945, the Caterpillar Company, under whose franchise the petitioner corporation received a major portion of its tractors, orally advised Basham, president of the petitioner, that unless Sydnor's connection with the petitioner's business was severed, the franchise granted by Caterpillar to petitioner would be terminated. Negotiations were immediately begun by Basham to acquire Sydnor's capital stock and that of his wife, Eva, the interest of Sydnor in the real estate, and the interest of Sydnor and his wife, Eva, in the lease dated September 11, 1940. On June 30, 1945, the stockholders of petitioner, the number of shares, and the class of stock owned by each were as follows: Stockholder
Common
Preferred
L. W. Sydnor
70
None
L. C. Basham
747
Eva D. Sydnor
680
None
Calvin R. Basham
3
Total
1,500
None
On June 30, 1945, an agreement was entered into by and between the West Virginia Tractor and Equipment Company, party of the first part; L. W. Sydnor and Eva D. Sydnor, parties of the second part; L. C. Basham, party of the third part, and the Charleston National Bank, as trustee, party of the fourth part, pursuant to which *21 L. W. Sydnor and Eva D. Sydnor, being the owners of 750 shares of capital stock of the West Virginia Tractor and Equipment Company, agreed, among other things, to sell those shares to L. C. Basham for $250 per share or for a total of $187,500, and to deliver the certificates evidencing the stock, to the Charleston National Bank, trustee. The purchase of this stock by L. C. Basham did not include L. W. Sydnor's interest in the land and building used by petitioner. All dividends paid by the petitioner subsequent to June 30, 1945, on its stock were paid to either L. C. Basham or his son, Calvin. On June 30, 1945, the Sydnors executed other agreements pursuant to which they sold their interests in the lease of September 11, 1945 to Pearl Basham, and their interests in the real estate to L. C. Basham. On July 2, 1945, Pearl Basham bought a one-half interest in the real estate from L. C. Basham for about $30,500, secured by a vendor's lien on the land. This transaction was a sale and it was not a gift. In accordance with the June 30, 1945 agreement covering the purchase of the Sydnors' stock, L. C. Basham, or his assignees, made the payments totalling $187,500 during the period June 30, 1945 to *22 July 1, 1949. The gross sales of petitioner, the total amounts of the rent paid under the terms of the lease of September 11, 1940, on the basis of 1 1/2% of gross sales, for the years 1945 through 1949, the amounts disallowed and allowed, respectively, by the Commissioner were as follows: Amount Allowed
Amount
as Deductions
Disallowed
Year
Gross Sales
Amount Paid
by Respondent
by Respondent
1945
$2,238,006.24
$33,589.66
1946
3,565,284.90
53,799.34
1947
4,610,597.65
* 69,059.93
$27,703.58
$41,406.35
1948
6,322,072.30
* 94,834.04
38,003.79
56,911.61
1949
4,722,155.36
* 70,924.83
28,383.13
42,616.90
The percentage rental of 1 1/2 per cent of gross sales with a minimum annual rental of $7,200 was a fair rental provision to insert in the lease when it was made on September 11, 1940; it was intended to represent true rent; and it was in conformity with the prevailing rates for rentals of similar property. The term of the lease, 10 years, with the option to renew, was reasonable. There was a legitimate business purpose for petitioner's *23 not constructing the building in question, for petitioner's leasing the property under a percentage lease such as the lease of September 11, 1940, and for the chief stockholder's taking title and leasing to petitioner. When the lease was executed the principal stockholders of petitioner did not have any reason to anticipate that petitioner would realize the volume of sales which were achieved in the years 1947, 1948, and 1949. The lease was executed in an arms-length, bona fide transaction. There was no intention that the rental payments required by the lease would represent something other than rent. The amounts of rent which petitioner was required to pay, by the terms of the lease, for 1947, 1948, and 1949 were required to be paid in order that petitioner could continue to use and occupy the premises. The amounts paid are deductible in full as rental expenses. Opinion The factual question to be decided is whether the petitioner is entitled to deduct as rental expense in the taxable years the entire sum which it paid each year pursuant to the terms of the lease of September 11, 1940. The Commissioner has partially disallowed the deductions on the ground that the sums paid were *24 unreasonable in amount. Section 23 (a) (1) (A), I.R.C., provides for the deduction in computing net income of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The respondent contends that the portion of the claimed rental deductions disallowed by him in each of the taxable years did not in fact represent a payment required to be made by the petitioner for the continued use and possession of the property, but was, in effect, a distribution of profits of the petitioner. He apparently challenges the deductibility of the amount claimed by the petitioner as rent because of the identity of interest enjoyed by Basham after June, 1945, as a result of the sale by Sydnor and his wife of their stock to Basham, and the sale and assignment by Sydnor of his one-half interest in the lease to Basham's wife. Respondent argues, in effect, that since Basham owned *25 and controlled both the petitioner and a one-half interest in the lease, and since his wife owned the other one-half interest in the lease, the Bashams had a duty to cancel or modify the 1940 lease and rent the premises to petitioner at a lower rental, when the rental payments called for under the lease were becoming increasingly large due to the expanded volume of sales. Respondent would conclude that since the Bashams failed to rewrite the lease with the corporation, and continued to accept the large rentals, the amounts determined by him to be in excess of a fair rent for the property, during the taxable years, are to be considered a distribution of earnings. The petitioner contends that deductions for rent are not strictly limited by the statute to "a reasonable allowance" as in the case of officers' salaries; that the character of the payments here in question must be judged in the light of the facts and circumstances existing when the lease agreement was executed in 1940; and that, when so judged, it is clear that the rental payments fixed by the lease, based on 1 1/2 per cent of gross sales with a specified minimum rent of $7,200, were intended to and did represent a true *26 and fair rent for the property, and that the percentage provision of the lease was not in any way designed as a disguise for the distribution of corporate earnings. Petitioner argues that the terms of the lease, and the facts and circumstances surrounding its execution evidence an armslength transaction and fair dealing, and that, since the lease agreement was bona fide when executed in 1940, the amounts paid by the petitioner as rent during the taxable years in accordance with its provisions are deductible, since the payments were required under the lease as a condition to the continued use and possession of the property. This is so, petitioner concludes, notwithstanding the fact that due to unexpected and unforeseen increases in gross sales, the rental payments in question were larger than the amounts anticipated when the lease was executed, and were greater than the petitioner would have been required to make if it had entered into a new lease at the beginning of any of the taxable years. We agree with the petitioner. The Code does not strictly limit deductions for rental payments to "a reasonable allowance" as in the case of salary or compensation. Stanley Imerman, 7 T.C. 1030, 1037. *27 As we said in Roland P. Place, 17 T.C. 199, 203, affirmed 199 Fed. (2d) 373, "The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law 'required' to pay these sums as rent. See section 23 (a) (1) (A) of the Internal Revenue Code. When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. Manos v. Commissioner, 187 Fed. (2d) 734; Stanwick's, Inc., 15 T.C. 556, affd. (C.A. 4), June 25, 1951; Limerick's, Inc., 7 T.C. 1129, affd. 165 Fed. (2d) 483; Hightower v. Commissioner, 187 Fed. (2d) 535. See Commissioner v. Lincoln Electric Co., 176 Fed. (2d) 815. [Italics supplied]" The character *28 of the payments in question must be judged in the light of all the provisions of the agreement pursuant to which they were made, and the facts and circumstances existing at the time the agreement was executed. This principal has been applied in determining the reasonableness of payments under agreements providing for contingent compensation for personal services, and in our opinion is equally applicable to payments made under a percentage lease agreement. See Austin v. United States, 28 Fed. (2d) 677; California Vegetable Concentrates, Inc., 10 T.C. 1158. The practice of fixing rentals for commercial properties on a percentage of sales basis instead of on a flat rate basis is a recognized and accepted practice. See Stanley Imerman, supra; Stanwicks, Inc., supra. Because of the close relationship existing between the lessor and the lessee in the instant case, we have scrutinized the provisions of the lease agreement, and the facts and circumstances surrounding its execution. There is nothing in the evidence and record before us to indicate that the lease of September 9, 1940, pursuant to which the amounts in controversy were paid, *29 was conceived as a device to avoid taxes, or that the payments provided for in the lease, in whole or in part, were intended to be anything other than rent. The evidence establishes, and we have found as a fact, that the two principal stockholders had a legitimate business purpose in taking title to the property in question and leasing it to the petitioner, rather than having the corporation use its own funds and restrict its credit in acquiring a business site; that the provision of the lease agreement fixing the rental at 1 1/2 per cent of gross sales was fair when the lease was executed, and in conformity with prevailing occupancy costs for similar properties; that the term of the lease, a period of ten years, was a reasonable one; and that the principal stockholders did not have any reason to expect, or any basis for a belief in 1940, that, during the term of the lease, the petitioner would realize the volume of sales enjoyed during the taxable years resulting from the economic dislocations of a war. We, therefore, conclude that the lease agreement of September 11, 1940, was entered into in an arms-length transaction, and that the payments made by the petitioner in 1947, 1948, *30 and 1949, pursuant to the terms of the lease, were in fact required to be made as a condition to the continued use and possession of the property. It is immaterial that during the taxable years, which were the 7th, 8th, and 9th years of the lease, the amounts required to be paid under the lease proved greater than the amounts which would have been required under a lease executed in any one of these years. See Stanley Imerman, supra; Consolidated Vegetable Concentrates, Inc., supra. The authorities relied on by the respondent, Limerick's, Inc., supra; Stanwick's, Inc., supra; and Roland P. Place, supra, are distinguishable on their respective facts from this proceeding. It is held that the amounts claimed by the petitioner as a deduction, in each of the taxable years, for rent constitute an ordinary and necessary business expense and are deductible in full under section 23 (a) (1) (A) of the Code. Since the petitioner concedes the correctness of other adjustments made by the respondent, Decision will be entered under Rule 50. Footnotes
*. Does not include rent paid to others of $40, $71.36, and $50.20, respectively.↩