**ARKHOLA SAND & GRAVEL COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 1523.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Dec. 22, 1960.

30

Daily & Woods, Fort Smith, Ark., Rose, Meek, House, Barron & Nash, Little Rock, Ark., for plaintiff.

William A. Miner, Dept. of Justice, Washington, D. C., Charles W. Atkinson,

U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This is an action by plaintiff, Arkhola Sand & Gravel Company, for the recovery of income taxes which it alleges were erroneously or illegally assessed and collected for the calendar years 1952 and 1953.

Jurisdiction is conferred by Title 28 U.S.C.A. § 1346(a) (1), as amended (1959 Supp.).

The case was tried to the court without a jury on November 7, 1960. At the conclusion of the plaintiff's case, the Government filed a motion to dismiss, alleging that the plaintiff failed to carry its burden of proving that the Commissioner's determination was erroneous, and that the plaintiff failed to prove its right to relief. The court deferred action on the motion, and the Government chose not to introduce any evidence and to stand on its motion. The case was then submitted, and briefs were requested from the parties in support of their respective contentions. The briefs have now been received and considered, along with the evidence and the exhibits, and the court now files this opinion in lieu of formal findings of fact and conclusions of law.

The plaintiff was incorporated under the laws of the State of Arkansas on May 18, 1926, for the purpose of conducting a sand and gravel business, and has carried on such business since that date.

Following an examination of plaintiff's income tax returns for the calendar years 1952 and 1953, the Commissioner of Internal Revenue determined that the equipment rentals paid by plaintiff to W. S. Dills & Sons and to Dills Bros., partnerships, for the rental of equipment during 1952 and 1953 were excessive in the amounts of $78,897.00 in 1952 and $39,173.71 in 1953.

The plaintiff alleges that the Commissioner erroneously disallowed said amounts as deductions in determining plaintiff's taxable income for 1952 and 1953, and that as a result of the disallowance as a deduction, the Commissioner erroneously increased plaintiff's deduction for accrued Arkansas income taxes by the amounts of $3,944.85 for 1952 and $1,689.79 for 1953; that the rentals paid by plaintiff during 1952 and 1953 were reasonable in amounts and were properly deductible as a business expense; and that plaintiff's accrued Arkansas income taxes of $2,355.35 for 1952 and $70.74 for 1953, as reflected by plaintiff's federal income tax returns for those years, were correct.

That based upon the alleged erroneous determinations, the Commissioner assessed against plaintiff income tax deficiencies for 1952 and 1953 as follows:

| Year | Tax Deficiency | Interest | Total Assessment |
|---|---|---|---|
| 1952 | $38,975.11 | $12,554.28 | $51,529.39 |
| 1953 | 10,826.80 | 2,782.19 | 13,608.99 |
| Totals | $49,801.91 | $15,336.47 | $65,138.38 |

On June 26, 1958, the plaintiff paid $64,897.21 and on August 5, 1958, paid the remainder of $241.17. The plaintiff prays judgment against the defendant for the total sum of $65,138.38, with interest from the date of the payments.

The defendant in its answer denies that any taxes were erroneously or illegally assessed and collected, but admits "that the Commissioner of Internal Revenue, after an examination of the plaintiff's income tax returns for 1952 and 1953, determined that the equipment rentals paid by the plaintiff to Dills Bros. during 1952 and 1953 were excessive in the respective amounts of $78,897 and $39,173.71, and the Commissioner disallowed said amounts as deductions in determin-

ing plaintiff's income for 1952 and 1953, and admits that the Commissioner increased plaintiff's deductions for accrued Arkansas income taxes by the amounts of $3,944.85 for 1952 and $1,698.79 for 1953."

On August 4, 1960, the parties executed and filed a stipulation in which they stipulated that during 1952 and 1953 the corporate stock of plaintiff consisted of 600 shares of common stock issued and outstanding. These shares were owned by the following persons in the amounts specified:

| Name | Number of Shares Owned in 1952–1953 |
|---|---|
| W. W. Dills | 210 |
| R. N. Dills (brother of W. W. Dills) | 130 |
| Cyrena Dills (mother of R. N. Dills and W. W. Dills) | 100 |
| Louise Kroh (sister of R. N. Dills and W. W. Dills) | 25 |
| Beulah K. Dills (aunt of R. N. Dills and W. W. Dills) | 75 |
| P. P. Nesbitt (no relation) | 30 |
| R. C. Clement (no relation) | 30 |
| Total number of shares | 600 |

Pursuant to the determination of the Commissioner of Internal Revenue that a portion of the payments made by plaintiff on account of the equipment was excessive, the additional income taxes were assessed for the calendar years 1952 and 1953. Following the payment of the assessments, the plaintiff on February 26, 1959, filed timely claims for refund for 1952 and 1953, and by letter of October 7, 1959, these claims for refund were denied.

In 1906, W. S. Dills, the father of W. W. Dills and R. N. Dills, and the husband of Mrs. Cyrena Dills, was one of the organizers of Yahola Sand & Gravel Company of Muskogee, Oklahoma (hereinafter called Yahola), and was also one of the founders in 1926 of Arkhola Sand & Gravel Company of Fort Smith, Arkansas (hereinafter called Arkhola). W. S. Dills was president of both corporations from the dates of their incorporation until his death in December 1944. W. W. Dills became an officer and employee of Arkhola in 1927, and R. N. Dills became an officer and employee of Arkhola in 1935. Following the death of W. S. Dills in 1944, W. W. Dills became the Chairman of the Board of Directors and Vice President of both Arkhola and Yahola, and R. N. Dills became President of both corporations. W. W. Dills lived in Muskogee, Oklahoma, and was general manager of Yahola, and R. N. Dills lived in Fort Smith and was general manager of Arkhola.

Prior to the death of W. S. Dills in 1944, the Board of Directors of both Arkhola and Yahola were W. S. Dills and his two sons, W. W. and R. N. Dills. Following the death of W. S. Dills, Louise Kroh, a sister of W. W. and R. N. Dills, became a member of the Board of Directors of both corporations. Those three have continued to serve as the only members of the Board of Directors of both corporations since 1944, although Louise Kroh has not been active in the management of either corporation. W. W. and R. N. Dills have been active in the management of both corporations since the death of their father. All matters of policy and important decisions involving the operation of both corporations have been the joint decisions of the Dills brothers.

In 1937 the Board of Directors of Arkhola decided to go into the concrete ready-mix business to provide another market for its sand and gravel business and to diversify its operations. Arkhola had no experience in the concrete ready-mix business and did not know whether a concrete ready-mix market could be developed in the Fort Smith area. Arkhola was short of capital, and W. S. Dills and his two sons were hesitant to force the other stockholders of Arkhola into the risk of a new business venture. Therefore, W. S. Dills & Sons, a partner-

ship consisting of W. S. Dills and the two sons, W. W. and R. N. Dills, was formed to purchase the ready-mix equipment. Arkhola began its concrete ready-mix business in 1937 with two trucks and two mixers which W. S. Dills & Sons purchased for $5,583 and rented to Arkhola for 50¢ per cubic yard of concrete produced without any minimum guaranteed rent.

Upon the death of W. S. Dills in 1944, Mrs. W. S. (Cyrena) Dills succeeded to the one-third partnership interest of her deceased husband in W. S. Dills & Sons. A new partnership was formed under the same name, W. S. Dills & Sons, and the sons and their mother continued to own and rent concrete ready-mix equipment to Arkhola. This partnership is still in existence, with each partner owning a one-third interest therein and sharing the profits and losses equally. By January 1, 1952, W. S. Dills & Sons owned a Chrysler mixermobile and eight tandem trucks and mixers, 2½ to 4½ yards, which cost the partnership a total of $79,286.68. During the years 1952 through 1955, W. S. Dills & Sons acquired ten additional trucks and mixers which cost the partnership an additional $132,573.15.

All of this equipment was used by Arkhola, and the partnership continued to charge Arkhola the same rental which it had charged since the rate was established in 1937, i. e., 50¢ per cubic yard of concrete produced, with no minimum guaranteed rent.

At various times since 1937 and as additional equipment was acquired, the partnership, W. S. Dills & Sons, considered increasing the rental rate for concrete ready-mix equipment. However, they were advised by Mr. J. L. Swofford, the accountant for Arkhola prior to his death, against any increase in the rental rate. Mr. Swofford advised the partners that rental rates between family businesses were subject to careful scrutiny by the Internal Revenue Service, and that consistency in the rental rate from year to year was highly desirable. Therefore, the partnership never increased the rent-

al rate for concrete ready-mix equipment, although the partners considered the rental rates far too low during the years 1952 through 1955.

In 1946, following severe damage to the Arkhola Sand & Gravel plant by floods on the Arkansas River in 1943 and 1945, the Board of Directors decided to embark upon an expansion and diversification program.

In accordance with the program, Arkhola decided to rebuild its special sand plant, which had been destroyed by the 1943 flood. At that time, because no new equipment was available during the war years, the concrete ready-mix equipment owned by W. S. Dills & Sons and leased to Arkhola was worn out and badly in need of replacement. The Directors of Arkhola decided that the concrete ready-mix equipment should be replaced and increased, which required a substantial capital investment by W. S. Dills & Sons or by Arkhola. It appeared to the Board of Directors of Arkhola that greater diversification was necessary to avoid dependency upon the sand and gravel and the concrete ready-mix business. Consequently, the Board decided that Arkhola would enter (a) the concrete business, (b) the asphaltic concrete business, (c) the crushed rock business, and (d) the road construction business if that became necessary to protect the other businesses of Arkhola. No time table was set for entering into these new ventures.

At that time, W. W. and R. N. Dills were, for all practical purposes, the Board of Directors of Arkhola, since their sister, Louise Kroh, took no active part in the management of the business. W. W. and R. N. Dills knew that Arkhola did not have enough capital to undertake the proposed expansion program, and that it had no experience in the proposed new ventures and no established market existed for the proposed new products. However, the Dills brothers felt that their position of trust with respect to the other stockholders of Arkhola was such that they should not force the other

stockholders into the new business ventures without attempting to minimize the risk insofar as Arkhola was concerned. It was then decided that W. S. Dills & Sons, the partnership which had theretofore provided the concrete ready-mix equipment, would purchase and continue to lease to Arkhola the new concrete ready-mix equipment which was badly needed. Accordingly the partnership did expend approximately $53,400 for new trucks and concrete mixers as rapidly as they became available in 1946 and 1947, and purchased an additional $20,800 worth of concrete ready-mix equipment by the end of 1950, all of which equipment was leased to Arkhola at 50¢ per cubic yard of concrete produced with no minimum guaranteed rent, being the same rent which had been first established in 1937.

As to the concrete block business it was decided that Arkhola would build the building and dry kilns for the concrete block plant, and that Dills Bros., a new partnership consisting of W. W. and R. N. Dills, would purchase and rent to Arkhola the concrete block machine. The plant was built by Arkhola in 1946, and Dills Bros. purchased a Stearns concrete block machine for $10,225.32, which was rented to Arkhola at a rental of 1¢ per concrete block produced without any fixed minimum rental. This rental remained in effect on the Stearns concrete block machine until in November 1953, when Dills Bros. acquired a new Bergen concrete block machine, including racks and pallets, at a cost of $70,000. Following the acquisition of the new Bergen machine, the rental was raised to 1½¢ per concrete block produced without any guaranteed minimum rental.

The decision to go into the asphalt business involved the same risk as the decision to go into the concrete block business. However, Dills Bros. purchased the asphalt plant and rented it to Arkhola, because Arkhola did not have capital to purchase the same. In 1947, Dills Bros. bought a Barber Greene asphalt plant at a cost of $31,402.42, which began operations, and in December 1955 the plant was converted to electricity. The rental established for the asphalt plant was 20 percent of the sales of asphalt produced, which remained in effect from July of 1947 until October of 1953. In 1953, the partnership realized that if Arkhola was to meet competition, it would be necessary for Arkhola to sell some asphalt at less than $5 per ton. Consequently, the rental charge was changed to 20 percent of all sales on asphalt sold for $5 or more per ton and 10 percent of sales on asphalt sold at less than $5 per ton.

The following table represents what occurred under the new schedule in the operation of the asphalt plant:

| Year | Tons Produced | Rental Income | Income Per Ton |
|---|---|---|---|
| 1947 | 25,972.79 | $ 15,463.56 | $0.60 |
| 1948 | 28,973.53 | 29,330.21 | 1.01 |
| 1949 | 52,321.59 | 47,862.99 | 0.91 |
| 1950 | 48,421.36 | 57,911.76 | 1.20 |
| 1951 | 31,001.46 | 34,128.93 | 1.10 |
| 1952 | 49,409.19 | 55,329.81 | 1.12 |
| 1953 | 34,264.72 | 46,859.91 | 1.37 |
| 1954 | 34,025.00 | 30,578.76 | 0.90 |
| 1955 | 37,536.00 | 36,015.35 | 0.96 |
| Totals | 341,925.64 | $353,981.28 | (Ave.) $1.03 |

The quarry was opened in 1951. At that time Dills Bros. purchased a Cedar Rapids 2540 rock crusher, with power generator set, and bin and sizing unit.

at a cost of $63,415.71, which the partnership rented to Arkhola at a rental of 20¢ per cubic yard of crushed rock sold with no minimum guaranteed rent. In November 1953 the partnership purchased a Bucyrus Erie 54B shovel at a cost of $65,000, and furnished it to Arkhola at no additional rental charge. In December 1955 the partnership purchased a Symonds cone crusher, 4¼ ft., at a price of $25,648.20, which was rented to Arkhola at no additional rental charge. In other words, all of the quarry equipment, costing $154,063.91, was rented throughout the period of 1952 through 1955 at 20¢ per ton of crushed rock sold with no guaranteed minimum rental.

In 1951 the Board of Directors of Arkhola decided the company should own or lease a tractor and trailer with which to haul its concrete blocks across state lines without an ICC permit. As a result, Dills Bros. acquired a used GMC tractor and Fruehauf trailer from a financially distressed contract hauler for $5,640, and rented the same to Arkhola for $600 per month. In January 1953, this GMC tractor was replaced with a new Ford tractor at a cost of $6,566.83, and Dills Bros. continued to rent the new Ford tractor and Fruehauf trailer to Arkhola at $600 per month.

It was found that Arkhola needed a flat-bed truck for local deliveries of concrete blocks. Since October of 1950 Arkhola had rented a flat-bed truck from L. N. Stem of Fort Smith for $125 per month. In May of 1952, W. S. Dills & Sons took one of its used concrete mixer trucks, put a flat-bed body on it and rented it to Arkhola for $100 per month.

This was all of the equipment which was leased by either W. S. Dills & Sons or Dills Bros. to Arkhola during the years 1952 through 1955.

The report of the Internal Revenue agent who conducted the investigation was introduced into evidence, along with the exhibits thereto. The formula devised by the agent and followed by him in computing what he determined to be "reasonable rentals" for the equipment consisted of taking the average annual ownership expense for similar equipment, as compiled in a manual prepared by the Associated General Contractors of America, and adding thereto an estimated profit to the partnerships of 12 percent per year on its investment in the ready-mix equipment, concrete block machines, quarry equipment, and miscellaneous equipment, and adding an estimated profit of 20 percent per year on the investment in the asphalt plant.

The Agent computed the total rental paid by the plaintiff to the partnerships as including the cash rental actually paid to the lessors, plus all insurance, taxes, license fees, maintenance and repairs expended by the plaintiff on all of the equipment it used, including equipment owned exclusively by Arkhola.

Three prominent heavy equipment dealers and lessors from this general area testified as to the general practice and custom of the industry involved. These witnesses were Wayne G. Clark, President of the Clark Equipment Company, of Little Rock, Arkansas, and Vice-President of Tri-State Equipment Company of Memphis, Tenn.; George W. Swisher, President and principal owner of Wiley-Stewart Machinery Company, Inc., of Oklahoma City, Okla.; and J. C. Mitchell, Vice-President and General Manager of Euclid-Arkansas, Inc., of Little Rock, Arkansas, and Vice-President of Shreveport Equipment Company of Shreveport, La. From the testimony of these experts in the field, the court finds that the leasing of heavy specialized equipment similar to that involved in this case was infrequent during 1952 and 1953, as it was too expensive and too specialized. When such equipment was leased on occasion, it was at substantially higher rentals than those charged by the partnerships, and minimum rentals were required. The court further finds rental rates charged by the lessors in this case were very reasonable and were in fact too low; that it is the practice in the heavy equipment leasing industry to require the lessee to pay insurance, taxes, license fees and repairs and maintenance, less ordi-

nary wear and tear, on the equipment while in the lessee's possession. The standard lease form used by rental companies so requires.

The plaintiff also introduced a manual prepared by the Associated Equipment Distributors containing a compilation of rental rates for construction equipment during 1953. Rental rates for some, but not all, of the equipment with which we are concerned were stated. A study of this manual discloses that the majority of rentals paid by Arkhola for the equipment listed was far less than the national average as reflected in the manual.

The various rentals charged or computed on the equipment are compiled in the following chart:

| Equipment | | Actual Rent Paid | Actual Rent Paid plus ins., taxes, maint., repairs, etc., paid by plaintiff * | Reasonable rent as computed by Int. Rev. Serv. Agent | Average rent in U.S. computed from rental rate manual |
|---|---|---|---|---|---|
| Ready-Mix | 1952 | $19,843.20 | $ 46,314.00 | $ 64,823.45 | $ 57,031.97 ** |
| Equipment | 1953 | 19,565.73 | 38,652.68 | 66,263.24 | 58,419.14 ** |
| | 1954 | 21,534.65 | 49,233.55 | 79,598.83 | 73,181.23 ** |
| | 1955 | 28,099.32 | 56,793.48 | 108,878.35 | 104,813.74 ** |
| Masonary | 1952 | 28,250.06 | 39,032.48 | 11,247.85 | Not |
| Plant | 1953 | 28,665.15 | 46,086.08 | 24,085.85 | available |
| | 1954 | 49,590.22 | 67,546.44 | 88,247.85 | |
| | 1955 | 64,782.36 | 90,448.04 | 88,247.85 | |
| Quarry | 1952 | 27,752.72 | 69,902.10 | 38,049.43 *** | 87,513.68 |
| Equipment | 1953 | 21,627.96 | 55,063.17 | 43,899.43 | 95,019.68 |
| | 1954 | 24,814.40 | 49,886.35 | 73,149.43 | 132,549.68 |
| | 1955 | 42,358.40 | 66,668.44 | 74,111.24 | 135,499.42 |
| Asphaltic | 1952 | 55,329.81 | 59,765.95 | 20,725.60 | 38,484.00 |
| Equipment | 1953 | 46,859.91 | 50,933.21 | 20,725.60 | 38,484.00 |
| | 1954 | 30,578.76 | 35,299.92 | 20,725.60 | 38,484.00 |
| | 1955 | 42,358.40 | 49,074.44 | 20,999.19 | 38,484.00 |
| Other | 1952 | 8,000.00 | 8,000.00 | 3,271.20 | Not |
| Equipment | 1953 | 8,400.00 | 8,400.00 | 4,987.32 | available |
| (Tractor | 1954 | 9,100.00 | 9,100.00 | 6,700.62 | |
| trailer, & | 1955 | 12,600.00 | 12,600.00 | 11,840.53 | |
| flatbed truck) | | | | | |
| Total all | 1952 | 139,175.79 | 223,014.53 | 138,117.53 | Not |
| Equipment | 1953 | 125,118.80 | 199,135.15 | 159,961.44 | available |
| | 1954 | 135,618.03 | 211,066.26 | 268,422.33 | |
| | 1955 | 190,198.48 | 275,584.40 | 304,077.16 | |

* Includes taxes, insurance, maintenance, etc., paid on equipment owned by Arkhola as well as leased equipment. The Commissioner treated the taxes, insurance, maintenance, etc., paid by Arkhola as additional rents to the lessors, whereas the actual amount paid the lessors is reflected in column one.

** Computed on stationary mixers—does not consider rental on trucks on which the mixers were mounted.

*** The Commissioner allowed $6,000 for repairs to quarry equipment in addition to this figure.

---

Section 23 of the Internal Revenue Code for 1939, 26 U.S.C.A. § 23, applicable here, provides as follows:

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or Business Expenses.

"(A) In general—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for the purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

An action to recover on a claim for refund is in the nature of an

action for money had and received, and it is incumbent upon the claimant to show that the United States has money which belongs to him. Not only must the plaintiff show that the Commissioner was wrong, but he must go further and establish the essential facts from which a correct determination of his tax liability can be made. The burden is on the taxpayer to establish the exact amount to which he is entitled. To sustain the burden upon him, the taxpayer must prove the legality and amount of any deductions claimed. United States v. Pfister, 8 Cir., 1953, 205 F.2d 538. Therefore, the questions to be determined in this case are: (1) Did the plaintiff prove that the Commissioner's determination was erroneous, and (2) did the plaintiff prove that the rentals paid by Arkhola were not excessive? For the sake of clarity, these questions will be discussed separately.

(1) It is a well-established rule of federal tax law that the determination of the Commissioner of Internal Revenue is prima facie correct and casts upon the taxpayer the burden of proving that the determination of the Commissioner is incorrect or unreasonable. If the taxpayer fails to prove that the Commissioner's determination is incorrect or unreasonable, then the Government's computation must be taken as correct. Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. However, the presumption of correctness is a rebuttable presumption and will support a finding in favor of the Commissioner only in the absence of any substantial evidence to the contrary. When the presumption has been overcome by evidence, the presumption vanishes. Cullers v. Commissioner, 8 Cir., 1956, 237 F.2d 611. It should be noted that the 1939 Code did not expressly limit the deduction for rental payments to "a reasonable allowance," as it did in the case of deductions for salary or compensation. However, when there is a close relationship between the lessor and the lessee, as in the instant case, and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. Roland P. Place, 1951, 17 T.C. 199, 203, affirmed per curiam 6 cir., 1952, 199 F.2d 373. In Midland Ford Tractor Co. v. Commissioner, 8 Cir., 1960, 277 F.2d 111, the Court stated the rules in a case of this type by quoting from Brown Printing Co. v. Commissioner, 5 Cir., 1958, 255 F.2d 436. At page 438 of the Brown case the court said:

"It is entirely appropriate, therefore, for the Commissioner to inquire into payments in the nature of rent and disallow such part as may be excessive in amount, and if such determination of disallowance is soundly based, his action carries with it a presumption of correctness. Furthermore, while the actual contract made between parties dealing fully at arm's length is usually persuasive of its reasonableness, no such inference can arise from the execution of a contract between persons having an interest on both sides of a transaction."

The plaintiff contends that the Commissioner erred in several respects in his determination.

Plaintiff contends that the Commissioner erred in failing to determine the reasonableness of the rental rates as of the time the rates were established and over the life of the leases. The undisputed evidence in this case reflects that the use of rental equipment by Arkhola first began in 1937, when it rented certain ready-mix equipment from W. S. Dills & Sons, and continued to rent the ready-mix equipment from the partnership of W. S. Dills & Sons until the death of W. S. Dills. Then a successor partnership was formed under the same name composed of Mrs. W. S. (Cyrena) Dills, and W. W. and R. N. Dills, but the rental charge was not increased insofar as the equipment used in the ready-mix business was concerned. Apparent-

ly the partnership of W. S. Dills & Sons, formed after the death of W. S. Dills, never made a partnership return as such, but the partnership of Dills Bros., which began leasing equipment to Arkhola in 1946, always made partnership returns.

No change was made in the rental charges on the equipment leased by Dills Bros. from 1946, except that in 1953, when the partnership purchased the new Bergen concrete block machine with racks and pallets, the rate of rental was changed from 1¢ to 1½¢ per concrete block. Also, in 1953 the partnership of Dills Bros. reduced the rental on the asphalt plant equipment from 20 percent of all sales to 10 percent on all sales below $5 per ton. The 20 percent on all sales above $5 per ton remained constant.

█ It is likewise undisputed that the Commissioner chose two years out of an extended lease period and determined that the rentals for those years were excessive. The courts have held that this approach to the reasonableness of a percentage lease is in error, and that if the lease is reasonable when made, the fact that the percentage rentals result in a higher rent for one year than would ordinarily be paid, does not make the rent excessive. This is true whether or not the lessor and lessee are related. This rule is clearly stated in Brown Printing Company v. Commissioner, supra. There the lease in question was entered into in 1949 as a 10-year extension of an original 4-year lease made in 1945. The stock of the lessee corporation was owned by trustees who also owned the building in question, so that the two parties admittedly could not deal at arm's length in making the lease. The lease provided for payment of a monthly rent of $400, or 4 percent of gross receipts, whichever was the higher. For the two tax years in question in that case the corporate taxpayer deducted as rent $22,401.62 in 1952, and $15,814.65 in 1953. The Commissioner disallowed as a deduction all rents over $10,609.03 per year. The Tax Court raised this figure to $12,325 per year, which it found to be a reasonable rent for the years in question. In reversing the Tax Court, the Court of Appeals for the Fifth Circuit said at pages 439–440 of 255 F.2d:

"Petitioner strongly insists here that it is relatively unimportant what 4% gross receipts actually produced in these two years in the middle of a ten year lease, if in fact the parties can be said to have made a reasonable bargain in 1949 when the lease was made. In view of the fact that the rental guaranteed here was only $4800 per annum, whereas the Tax Court found that $12,325 was reasonable in 1952 and 1953, it is quite apparent that it would have been mathematically possible for the rent in those years under this lease to have been much less than a reasonable rent. Likewise the rent for any one year could be less than the amount found by the court to be reasonable.

"As it was possible under any ten year percentage lease for the landlord to get less than a fair rent in poor years, thus it is reasonable to assume that an ordinarily prudent lessor would insist on a percentage figure that would likely yield him *more* than a reasonable figure for any particular year or years. It is significant that the rent computed at 4% produced only $7,000 the first year of the original lease; to be sure, this had gone up to $15,400 for the year before the new one was negotiated. We are not told what the experience was for 1946 or 1947. Those years, together with 1945 at $7,000 and 1948 at $15,400, represented the history which would normally be in the minds of the parties where they came to fix the terms for the next ten years. Perhaps the experience was such and prospects were so good that any ordinarily prudent man would know that in all likelihood the experience over the succeeding ten years would produce rents *averaging* well over a reasonable figure for the period. The Tax Court, however,

did not ascertain the truth of that matter. It directed its attention to the reasonableness of the rents received in two years only. This, we think, is not the question it had to resolve. It should instead have ascertained what would be a reasonable lease for the entire period. If in fact all the evidence adduced on the subject would cause the court to hold that, viewed as of May, 1949, this was a reasonable lease, then it would be entirely immaterial if, fortuitously all went beyond the fondest expectations of the parties in 1949, and in 1952 and 1953 the 4% factor produced rent all out of proportion to what would be considered reasonable for a single year's rental viewed separately."

The Brown case has been quoted with approval on another point by the Court of Appeals for this Circuit in Midland Ford Tractor Co. v. Commissioner, supra.

For other cases dealing with excessive rentals of property covered by long-term leases, see West Virginia Tractor & Equipment Co., 12 T.C.M. 1476 (1953); Southern Ford Tractor Corp., 1958, 29 T.C. 833, 838; Estate of Frederick W. Sullivan, Sr., 10 T.C.M. 729 (1951).

The equipment in the instant case has been under lease from the same parties at virtually the same rates for many years. Throughout all of the years the Commissioner has never contended that the percentage rentals produced excessive rentals except in the years 1952 and 1953. As can be seen in the table, the revenue agent found, even under his formula, that the rental rates paid in 1954 and 1955 were well under his allowable.

■ Therefore, the Commissioner erred in taking two years out of a long-term lease on a percentage rental and contending that the rentals in those years were excessive merely because the volume of business done in those years produced a higher rent than would ordinarily be paid without considering the reasonableness of the rentals over the duration of the leases.

■ Plaintiff further contends that the Commissioner erred in considering that repairs, maintenances, tires, insurance, taxes and licenses paid by Arkhola were additional rents to the lessors. As hereinbefore noted, the Commissioner included all of the funds expended by Arkhola during 1952 and 1953 for the above mentioned items as additional rentals paid to the lessor. A substantial portion of these sums was spent by Arkhola for taxes, insurance, repairs, etc., on equipment owned exclusively by Arkhola. It can hardly be accepted that such expenditures on Arkhola's own equipment could conceivably be considered as additional rent to the lessor partnerships.

Plaintiff clearly proved by the three expert witnesses, and the court has so found, that it was the practice in the heavy equipment leasing business for the lessee to pay such expenses, less reasonable wear and tear, while the equipment was in his possession.

Therefore, the Commissioner erred in determining that such repairs, maintenance, tires, insurance, taxes and license fees paid by Arkhola were additional rents to the lessors.

■ The plaintiff, also, contends that the Commissioner erred in using the Associated General Contractors ownership expense manual as a basis in determining "reasonable rentals." It should be noted that this manual boldly states on its cover "This is not a rental schedule." In its foreword the manual further states: "The rates shown will not ordinarily be rates on which a concern engaged in renting equipment could exist." In discussing rental charges for contractors' equipment, the manual at page 4 states:

"When a contractor leases equipment to others, he is engaging not in construction, but in the business of equipment renting. This business has its own peculiar risks, and intangible costs which one without special experience is likely to underestimate. Determination of rates for such a business does not involve

questions of construction service and can probably be discussed best by specialists in the renting business.

"With respect to renting, the rates should be based on release of equipment in as good condition as when sent to a job, allowing, of course, for a reasonable amount of ordinary wear and tear."

It is undisputed that the agent conducting the investigation computed "reasonable rentals" by taking the ownership costs expressed in this manual and arbitrarily adding a profit figure to the lessor of either 12 or 20 percent, depending upon the equipment. When the propper function of the manual, as stated in its foreword, is considered, the court is convinced that the Commissioner erred in attempting to compute "reasonable rentals" based on this manual.

(2) The second question which must be determined by the court is whether the rentals paid by Arkhola were excessive. The evidence presented by the plaintiff in support of this proposition consisted of the testimony of R. N. and W. W. Dills, the testimony of the three expert witnesses, and the introduction of a "Rental Rate Manual" for the year 1953 prepared by the Associated Equipment Distributors, and introduced as an exhibit to the testimony of John O. Swofford, the accountant for Arkhola.

■ The Dills brothers both testified that in their opinion the rental rates charged by the partnerships were reasonable, and that they were established only after investigation into the practices in the industry. The Government contends that the testimony of the Dills brothers should not be considered due to their positions as stockholders and directors of the corporation. It is recognized that in this Circuit the court cannot be compelled to accept at face value the naked, interested testimony of the corporation or the stockholders, merely because that testimony is without direct contradiction by other witnesses. Heil Beauty Supplies, Inc. v. Commissioner, 8 Cir., 1952, 199 F.2d 193, 195. However, the court is not prohibited from accepting such testimony when the other elements of the case justify. Baltimore Dairy Lunch v. United States, 8 Cir., 1956, 231 F.2d 870, 874.

■ In the instant case W. W. and R. N. Dills testified not only that the rentals charged were reasonable, but also as to the reasons why it was necessary for Arkhola to rent the equipment and the methods used by it in fixing the percentage rentals. The Dills brothers are experienced businessmen who knew and appreciated the delicate nature of their dual status. Their testimony was consistent with the other facts in the case and is entitled to consideration by the court. In this regard see also A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 1950, 182 F.2d 300, and J. H. Robinson Truck Lines v. Commissioner, 5 Cir., 1950, 183 F.2d 739.

■ The testimony of the three experts on heavy equipment leasing practice is likewise entitled to consideration. These witnesses testified that in 1952 and 1953 the leasing of heavy equipment, such as that with which we are concerned in this case, was rare. This was due to the expensive specialized nature of the equipment. The Government attempts to discredit this testimony because none of the witnesses leased similar equipment in each instance during 1952 and 1953. These gentlemen were thoroughly familiar with the practices of the trade during the period in question however. The rule in this regard is stated in 7 Wigmore on Evidence, 3d Ed., Sec. 1954(a), as follows:

"It has sometimes been said that a witness to trade usage may state only *specific instances*, or must at least mention one or more in support of his statement of the general practice. This notion is traceable to some remarks of Lord Mansfield and later judges, which do not justify it. There have indeed been judges who have refused, on all the facts of a case, to credit witnesses to usage, who could not adduce instances in verification. But there is no rule of exclusion. The usage is itself a

fact, and the Opinion rule does not treat such testimony as an inference from data which can be adequately stated without the inference."

Each of the witnesses testified that during 1952 and 1953 the equipment in question here would only have been rented had the lessor been assured of receiving his total investment in the equipment back in less than 30 months. All agreed that the percentage rentals charged by the partnerships were very reasonable and were in fact too low. These expert opinions should not be arbitrarily disregarded by the trier of fact. See Cullers v. Commissioner, 8 Cir., 1956, 237 F.2d 611, 616; Planters' Operating Company v. Commissioner, 8 Cir., 1932, 55 F.2d 583, 585. It may also be noted that the Government chose not to offer any conflicting expert opinions as to the unreasonableness of the rentals. In Baltimore Dairy Lunch v. United States, supra, the Court of Appeals for this Circuit quoted with approval from Taylor & Co. v. Glenn, D.C.W.D.Ky.1945, 62 F.Supp. 495, 499, the following language at page 875 of 231 F.2d:

"* * * 'If the compensation received * * * was unreasonable for the services rendered, certainly the government could have produced some experienced witness * * * who would have said so. The lack of such evidence operates very strongly against the defendant's contention.' "

In addition to the ore tenus testimony of the Dills brothers and the three equipment dealers, the reasonableness of the percentage rentals charged is established by a manual containing a compilation of rental rates for construction equipment in 1953, prepared by Associated Equipment Distributors. The Government contends that this evidence should not be considered by the court because the rates reflected are "fantastic." This portion of the Government's argument is somewhat untenable since the Commissioner computed his idea of "reasonable rentals" based on a manual which expressly stated that it was not to be used as a rental guide. The court, however, notes that the figures in the rental manual are merely national averages and do not reflect the going rate in any single area.

Therefore, when all of the evidence in this case is considered as a whole, the court finds that the plaintiff has sustained its burden of proof and has proved by a preponderance of the evidence that the Commissioner's determination was erroneous and that the rentals paid by Arkhola were not excessive, but were entirely reasonable and, in fact, much smaller than plaintiff would have been required to pay to any other lessor.

Therefore, the plaintiff is entitled to recover of and from the United States the sum of $65,138.38, with interest on $64,897.21 from June 26, 1958, and on the remainder, $241.17, from August 5, 1958.

Judgment in accordance with the above is being entered today.