UNITED STATES of America, Plaintiff,

v.

Andrew J. FLORIDA et al., Defendants.

No. 1141.

United States District Court E. D. Arkansas, Jonesboro Division.

Dec. 2, 1959.

Osro Cobb, U. S. Atty., and James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., and Homer R. Miller, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Leon B. Catlett of Catlett & Henderson, Little Rock, Ark., E. J. Ball, Fayetteville, Ark., E. L. McHaney of Owens, McHaney, Lofton & McHaney, Little Rock, Ark., and Edward P. Russell of Canada, Russell & Turner, Memphis, Tenn., for defendants.

HENLEY, Chief Judge.

This is a civil action brought by the United States, pursuant to 26 U.S.C.A., 1954 Edition, Sections 7402(a) and 7403, to establish alleged income tax liabilities of certain of the defendants, to foreclose tax liens, and to obtain the appointment of a receiver. The cause is now before the Court upon the question of whether a receiver should be appointed.

The Court has considered the oral testimony and documentary evidence introduced by the parties, affidavits of agents of the Internal Revenue Service filed in support of the Government's application for a temporary restraining order and for the appointment of a receiver, memorandum briefs filed by the parties, and oral argument of counsel, and being well and sufficiently advised, files this memorandum opinion incorporating herein its findings of fact and conclusions of law bearing on the question of a receivership.[1]

The defendants are Andrew J. Florida and George H. Florida of Osceola, Arkansas, sometimes referred to herein as the "Florida brothers," their respective wives, a number of Tennessee and Arkansas corporations wholly owned and controlled by the Florida brothers, Reserve Estate Life Insurance Company, an Arkansas corporation, sometimes referred to as "Reserve Estate," the Union Planters National Bank of Memphis, Tennessee, and numerous other defendants, both individual and corporate.

The amended complaint alleges in substance that over a period extending from 1949 through 1955 the Florida brothers, acting personally and through their wholly owned and controlled corporations, engaged in the banking and insurance businesses, dealt extensively in real estate, made loans, and built and sold residential housing. It is alleged that during that period the Floridas and their corporations incurred very large income tax liabilities to the Federal Government, and that they undertook by various schemes and devices to evade the payment of said liabilities. It is further alleged that prior to the commencement of this action the Florida brothers by one means or another had dissipated and wasted assets to such an extent that it is doubtful that enough property remains to satisfy the claims of the Government for taxes, penalties, and interest. The prayer is for a determination of the defendants' tax liabilities, for appropriate judgments against various defendants, for foreclosure of the plaintiff's tax liens, and for appointment of a receiver or receivers *pendente lite*.[2]

---

1. The principal defendants have not answered the Government's complaint, but have filed numerous motions seeking a dismissal of the complaint, summary judgments, a more definite statement, and orders quashing service. An order is being entered today denying all of said motions and directing the filing of answers.

2. The Commissioner of Internal Revenue has filed a certificate reciting that it is in the public interest that a receiver or receivers be appointed and vested with all of the powers of a receiver in equity. See 26 U.S.C.A. § 7403(d).

The application for a receivership is resisted by the Florida brothers and their corporations, and also by the Union Planters National Bank, which holds in pledge certain collateral belonging to the Floridas. The Insurance Commissioner of the State of Arkansas has filed an intervention wherein he asserts that if there is to be a receivership, a separate receiver should be appointed for the Reserve Estate Life Insurance Company.

The Commissioner of Internal Revenue has made assessments of income taxes against certain of the defendants as follows:

a. Against the defendants, Andrew J. Florida and his wife, personally, for the year 1949 and for the years 1951 to 1954, inclusive, the sum of $3,882,-466.55, plus interest.

b. Against the defendants, George H. Florida and his wife, personally, for the years 1951 to 1954, inclusive, the sum of $1,662,052.49, plus interest.

c. Against the Tennessee corporate defendants for various years during the period in question, an aggregate of $2,-547,853.96, plus interest. Those defendants are: McAdams Company, Inc.; Norfolk Company, Inc.; R. M. Supply Company; Southern Housing Company; Joel Construction Company; Evans & Evans, Inc.; Frayser Company, Inc.; Gaylord Co., Inc.; Mason Company, Inc.; Speck Company, Inc.; Wells Station Company, Inc.; Acme Insurance Agency, Inc.; and Yow Company, Inc.

d. Against certain Arkansas corporations, defendants herein, for various years during the period, an aggregate of $1,191,305.97, plus interest. Those corporations are: Continental Mortgage Company (now Montgomery Investment Company); Williams Investment Company; Continental Company; Florida Real Estate Loan Company; Continental Investment Company; and Continental Land Company.

Notices of the foregoing assessments have been given by the Commissioner, and demands for payment have been made and refused. Hence, the taxes assessed, plus interest and penalties, to the extent that they are owed, are now due and payable.

All of the Tennessee and Arkansas corporations above listed are wholly owned by the Florida brothers, and all of them appear to be insolvent and to have insufficient assets to pay the tax claims asserted against them. The Florida brothers are probably insolvent personally, and they are certainly so if the tax claims of the plaintiff are sustained in full or in major part.

Reserve Estate Life Insurance Company is not now actively engaged in the sale of life insurance, but, according to the testimony of the Insurance Commissioner, it had on its books at the close of 1958 outstanding policies totalling $2,-402,551. The Commissioner also testified that as of the same time it had assets totalling $2,762,692, with a capital of $250,000 and liabilities of $141,268 (evidently exclusive of policy obligations), and the Commissioner in his intervention described the condition of the company as "wholly solvent". Assets of Reserve Estate include certain valuable lands in Poinsett County, Arkansas, which lands are producing rentals in excess of $170,000 per year; and the company also owns valuable securities, some of which are on deposit with the Insurance Commissioner.

Reserve Estate has outstanding 25,000 shares of capital stock, all of which shares are owned, directly or indirectly, by the Florida brothers.[3] All of this stock is in pledge however, 17,900 shares being held by the Union Planters National Bank, and 7,100 shares being held by

---

3. More specifically, it appears from the testimony that 12,900 shares of the Reserve Estate stock are owned by the Florida brothers directly; 5,100 shares are owned by the corporate defendant, Fidelity Mortgage Company, which is a corporation wholly owned by the Florida brothers, and 7,000 shares carried in the name of Fidelity Mortgage Company are actually the property of the Florida brothers.

Mrs. Corinne Watson of Lexington, Mississippi, who is a relative of the Floridas.

The record is meager as to the pledge of Mrs. Watson, but it does appear that at some time in the past she advanced about $135,000 to Andrew J. Florida and received Reserve Estate stock in pledge.

In January 1958, both of the Florida brothers and certain of their corporations were heavily indebted to the Union Planters National Bank and to other creditors. In addition, the brothers were about to be indicted on charges of income tax evasion. It was feared by those concerned that the expected indictments, which were believed imminent, would have extremely adverse effects upon the Florida enterprises, and it was desired to consolidate their obligations so as to minimize the financial impact of the anticipated criminal charges. It was also desired to strengthen the position of the Mississippi County Bank of Osceola, which bank the Florida brothers then owned.

In order to assist the brothers in their predicament, another brother, Thomas P. Florida, approached the Union Planters National Bank and induced it to make further advances for the benefit of Andrew and George Florida in sums totalling more than $1,500,000. Those advances were made to Stephens Co., Inc., a corporation which was wholly owned by Thomas Florida. Said advances were guaranteed by the Florida brothers, and Thomas Florida also assumed certain personal responsibility with respect thereto. The advances were secured by a pledge of the 17,900 shares of Reserve Estate stock, that have been mentioned, together with other collateral, and the proceeds of the advances were used to retire obligations of the Florida brothers, and to bolster the position of the Mississippi County Bank.

Another of the corporate defendants, Laran, Inc., the stock in which is wholly owned by the Florida brothers, holds legal title to a valuable residence in Osceola which is presently occupied by George H. Florida and his wife. It is claimed that Laran serves no useful business purpose, and is merely the alter ego of the Florida brothers, being employed to hold legal title to property which in fact belongs to them.

Andrew J. Florida and his wife, like the George Floridas, reside in a home of substantial value in Osceola, the title to which is in the defendant, Florida Real Estate Loan Company, against which corporation, as stated, certain taxes have been assessed.

The record reflects that for a number of years prior to the filing of this suit the Florida brothers had so manipulated the affairs of their corporations as to bring about numerous and perplexing transfers of property and funds among the corporations, and had also diverted large amounts of corporate funds to their own use. Such diversions were frequently effected by means of concealed or disguised payments with personal expenses of the Floridas being paid directly by the corporations and charged up as business expenses of the latter. The net effect of those diversions and transfers has been that the corporations, except Reserve Estate, Laran, Inc., Florida Real Estate Loan Co., and Fidelity Mortgage Co., now appear to be practically, if not entirely, devoid of assets.

Upon the institution of this action the Court entered a temporary restraining order for the purpose of preventing further wasting and dissipation of assets, and that restraining order has remained in effect without objection pending disposition of the application for the appointment of a receiver. During the interim, and largely through the efforts of Thomas Florida, advantageous sales have been found for certain of the collateral held by the Union Planters National Bank, which sales have been made with the approval of the Court, and the indebtedness to the Bank has been reduced very substantially.

From its consideration of the record before it the Court is convinced that there should be a receivership. As stated, the Government is proceeding under 26 U.S.C.A. §§ 7402(a) and 7403. Section 7402(a), insofar as here pertinent, provides that the district courts of

the United States shall have jurisdiction to appoint receivers, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws, and that the remedies provided by that section are cumulative to other available collection remedies. Section 7403 is entitled, "Action to enforce lien or to subject property to payment of tax", and is as follows:

"(a) Filing.—In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability.

"(b) Parties.—All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.

"(c) Adjudication and decree.— The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all the claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States.

"(d) Receivership.—In any such proceeding, at the instance of the United States, the court may appoint a receiver to enforce the lien, or, upon certification by the Secretary or his delegate during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."

The question of the Government's right to have a receiver appointed in a case of this kind seems to have been discussed in only three reported cases, namely: United States v. Peelle Co., D.C.N.Y., 131 F.Supp. 341, affirmed 2 Cir., 224 F.2d 667; United States v. Lias, D.C.W.Va., 103 F.Supp. 341, affirmed 4 Cir., 196 F.2d 90, and United States v. Pettyjohn, D.C.Mo., 84 F.Supp. 423. From a reading of those decisions it appears that while the Court has some discretion as to whether a receiver should be appointed that discretion may not be unlimited. Without undertaking to define the precise limits of judicial discretion to appoint or to refuse to appoint a receiver under Section 7403, it appears to the Court that if the record shows that a substantial tax liability probably exists, and that the Government's collection of the tax may be jeopardized if a receiver is not appointed, the appointment should be made. Cf. United States v. Pettyjohn, supra, 84 F.Supp. at page 427.

The Commissioner has made very substantial assessments which presumptively are correct. The materials before the Court disclose a pattern of dealings by the Florida brothers which are, at best, highly suspicious and which clearly warrant an inference of substantial under-reporting of income and underpayment of tax. Further, as the Court understands the argument of counsel, the defendants do not take the position that no taxes are owed, but simply that the Government's claims are grossly overstated. It thus appears that the Government has satisfied the first requirement for the appointment of a receiver.

For many months Andrew J. Florida, the dominating personality in the Florida operations, has been so physically incapacitated that he is utterly unable to attend to any business affairs, and George H. Florida, although in partnership with his brother, has little, if any,

familiarity with the details of the Florida businesses. Thus, there is a lack of capable proprietary management to look after the properties involved and to conduct business operations to the extent that such operations are being, or should be, conducted. The lack of such management becomes particularly significant when it is considered that Reserve Estate, by far the strongest of the Florida corporations, is now under the presidency of A. F. Barham, a semi-retired attorney who knows little, if anything, about the life insurance business.

It should be said that the subordinate employees who now have the properties in charge appear not to lack capability to perform routine business functions. But the Court does not feel that they fairly can be expected to exercise the functions of management required for handling and preserving the properties in the best interests of all of the interested parties, including the Government, or that the Government should be required to rely upon them for the protection of its security.

While the Court's temporary restraining order has been largely efficacious in preventing dissipation of assets and diversions of funds, it has not been entirely so. There has been some diversion since the order was entered, and the possibility of further diversions continues to exist. That possibility is enhanced by the fact that the restraining order permits the defendants now actively engaged in business to make expenditures in the normal course of their operations. These expenditures are being made by employees whose loyalties are to the Florida brothers rather than to the Treasury of the United States. It is also to be noted that the rents from the Reserve Estate lands are now being collected in substantial part by a brother-in-law of the Floridas who is not under bond.

■ Although the Court is convinced that there should be a receivership, it is not felt that the same should extend to Reserve Estate Life Insurance Company itself. That company is solvent, according to its last balance sheet. The appointment of a receiver might well have an adverse effect on the company's policy holders, its value as a going concern, and its future prospects. This the Court would avoid. It would seem that the rights of the Government can be adequately protected if the receiver assumes control of the stock of the insurance company, as contrasted to the company itself and its assets. With the receiver in control of the stock, he can exercise all rights that the owners thereof could exercise.

In resisting the Government's application the defendants, including the Union Planters National Bank, point out that Thomas P. Florida has done an excellent job in liquidating the indebtedness to the Bank, which is in the interest of all of the creditors, including the Government. They argue that no receiver could do as well, and that the appointment of a receiver will disrupt the orderly liquidation that Mr. Florida is attempting to carry out. The Court does not agree.

In the first place, the question of whether a receiver can duplicate Thomas Florida's accomplishments (and the Court has no inclination to minimize those accomplishments), depends in large measure upon the ability of the receiver. Moreover, there is no necessity for Mr. Florida's good offices to cease upon the appointment of a receiver. The receiver and Mr. Florida will be perfectly free to cooperate with each other to the extent that they may deem cooperation to be wise or necessary. And Mr. Florida's personal interest in the liquidation of the debt to the Bank and in the affairs of his brothers may well prompt him to cooperate.

■ More basically, however, the argument in question overlooks the fact that Thomas Florida's services, valuable though they may be, are limited to the liquidation of collateral owing to a single creditor. The functions of a receiver in this case are not so limited. They extend to the preservation of the entire estate and the protection of the rights of all of the creditors, to the collection of revenues accruing to the de-

fendants, to the discovery of assets not yet brought to light, and to the requiring of an accounting of their stewardship from the persons who have had charge of the properties since the entry of the temporary restraining order. It may also be necessary for the receiver to institute actions for the recovery of assets or to defend against claims brought against the estate. In the Court's estimation the Government is entitled to have those broad functions performed, and by an individual who has no connection with the Floridas or their operations.

It is expected that some little time will elapse between the appointment of the receiver and his assuming full and effective charge of all of the properties entrusted to his care. To avoid the possibility of a dissipation of assets during this transition period and to facilitate orderly transfer of control, the temporary restraining order will be continued in effect as a temporary injunction for a period of 60 days, and Fidelity Mortgage Company, originally omitted from said order, will be included within its terms.

Let an order in accordance with the foregoing be entered.