**UNITED STATES of America,**
**Plaintiff,**

v.

**Andrew J. FLORIDA et al., Defendants.**

**No. J–1141.**

United States District Court
E. D. Arkansas,
Jonesboro Division.

Dec. 10, 1965.

Robert L. Handros, John Adler, Norman Bayles, Attys., Dept. of Justice, Washington, D. C., and Robert D. Smith, Jr., U. S. Atty., E. D. of Arkansas, on the brief, for plaintiff.

Leon B. Catlett, Little Rock, Ark., E. J. Ball, Fayetteville, Ark., for defendants.

HENLEY, Chief Judge.

This protracted tax case was commenced by the Government in 1959 pursuant to 26 U.S.C.A. § 7403, for the purpose of establishing federal income tax liabilities, including fraud penalties, and to have federal tax liens declared and foreclosed with respect to certain Arkansas properties, both real and personal. The principal defendants are Andrew J. (A.J.) Florida and his brother, George H. (G.H.) Florida, citizens of Osceola, Mississippi County, Arkansas, and certain Arkansas and Tennessee corporations which during the relevant period of time were owned and controlled by the Florida brothers. The tax years involved are 1951, 1952, 1953, 1954, and 1959. Originally, alleged tax liabilities

for 1949 were also involved, but the Government's claims with respect to that year have been abandoned.

Upon the filing of the suit in March 1959 a receiver pendente lite was appointed to take charge of the property and affairs of certain of the defendants. United States v. Florida, E.D.Ark., 178 F.Supp. 627, aff'd 8 Cir., 285 F.2d 596.

The cause has been tried to the Court and has been submitted upon a voluminous record. This memorandum incorporates the Court's findings of fact and conclusions of law. All requests for findings and conclusions submitted by the respective parties are denied, except to the extent that they may be incorporated in this memorandum.

From 1949 through 1954 the Florida brothers engaged in business individually and through their controlled corporations; they also operated as co-partners. The business consisted principally of the construction and sale of residential housing in and around Memphis, Tennessee, but the Florida brothers also had other income producing enterprises, including dealings in real estate, farming, money lending, loan brokerage, and insurance. A. J. Florida and his wife also traded extensively in stock market securities, and both of the Florida brothers traded on the commodities market.

The construction of Tennessee housing with which the Court is concerned was carried out by 12 Tennessee corporations, which may be referred to collectively as the building corporations. Those corporations were: Evans & Evans, Inc., Frayser Co., Inc., Gaylord Co., Inc., Joel Construction Co., Mason Co., Inc., McAdams Co., Inc., Norfolk Co., Inc., R. M. Supply Co., Inc., Southern Housing Co., Speck Co., Inc., Wells Station Co., Inc., and Yow Co., Inc. Those corporations had common offices in Memphis, common office personnel, and common office management. With certain exceptions they were named after corporate officers or employees, and their stock was held nominally by such officers or employees. The Court finds, however, that the nominal stockholders were mere strawmen, and that all of the corporate stock of the building corporations was actually owned by the Florida brothers.

Another Tennessee corporation which is a defendant here is Acme Insurance Co., Inc., which was known for a time as Continental Insurance Co., Inc., and then later by its original name of Acme. That corporation's main source of income was premiums paid by the building corporations. The stock of Acme, like the stock of the building corporations, was actually owned by the Floridas.

The Arkansas corporations named as defendants herein are: Montgomery Investment Co. (formerly Continental Mortgage Co.), Continental Investment Co., Florida Real Estate Loan Co. (FREL), Williams Investment Co., Continental Co., and Laran, Inc., Montgomery Investment Co., hereinafter referred to by its original name, Continental Mortgage Co., Continental Investment Co., Continental Land Co., and FREL did business with the building corporations and also had dealings with businesses outside the Florida network. Williams Investment Co. and Continental Co. seem to have been primarily conduits for funds expended eventually for the benefit of the Florida brothers and Mrs. A. J. Florida.

The Arkansas corporations were centralized at Osceola, and, like the building corporations, had common office management and personnel. Funds from certain of the Arkansas corporations flowed to the building corporations, and the latter corporations, virtually penniless themselves as far as day to day operating capital was concerned, were dependent on the Arkansas corporations for the payment of their expenses.

The Florida operations were extensive and obviously produced tax consequences of great magnitude. During the period in question millions of dollars came into the Florida corporate network from outside sources, moved back and forth within the network, and eventually passed out of that network. Much of the flow of cash to destinations outside the network represented business expenses properly

deductible from corporate gross income in determining corporate tax liabilities. The rest of that flow came back to the partnership of A. J. and G. H. Florida or to the brothers individually or was spent for their personal benefit.

A chart of the Florida organization, introduced by the Government in the course of the trial, and which the Court finds to be accurate in general, depicts income entering the Florida network from such sources as sales of housing, loans, sales of mortgages and construction loans, interest, and commissions. The chart also shows the flow of cash within the network and to outside recipients.

In connection with its appointment of a receiver in the case the Court said in United States v. Florida, supra (p. 630 of 178 F.Supp.):

"The record reflects that for a number of years prior to the filing of this suit the Florida brothers had so manipulated the affairs of their corporations as to bring about numerous and perplexing transfers of property and funds among the corporations, and had also diverted large amounts of corporate funds to their own use. Such diversions were frequently effected by means of concealed or disguised payments with personal expenses of the Floridas being paid directly by the corporations and charged up as business expenses of the latter. The net effect of these diversions and transfers has been that the corporations, except Reserve Estate, Laran, Inc., Florida Real Estate Loan Co., and Fidelity Mortgage Co., now appear to be practically if not entirely, devoid of assets."

The theory of the Government is that with respect to 1951, 1952, 1953, and 1954 the Florida brothers and their corporations vastly understated their taxable incomes. Much of the alleged understatement of income is claimed to have been fraudulent; as to the rest of it no fraud is claimed.

With respect to those years the Floridas and some of their corporations reported taxable income totaling $817,465.-15. Norfolk Co., Inc. showed an overall loss for the three years in which it did business, and other corporations showed losses in certain years.

The present position of the Government is that the true taxable income of the defendants, both reported and unreported, for the years under consideration was $7,498,125.56, and that the alleged under reporting of $6,680,660.41 was fraudulent to the extent of $3,503,922.27. The Government's present figures result from the elimination of assessments for 1949, from the abandonment of certain specific fraud claims, and from the making of certain concessions and adjustments in the course of and following the trial of the case.

The 1959 assessments were made against the Florida brothers and their wives, Continental Investment Co., and Laran, Inc. The returns were filed by the receiver, and the deficiencies assessed were minor. No fraud is involved, and the Court does not consider that the assessments for that year are seriously involved in the case. Further discussion, therefore, will be limited to tax years 1951–1954.

As to those years the defendants do not now contend seriously that there were no tax deficiencies. Defendants do contend that the tax liabilities asserted by the Government are grossly excessive, and that the defendants were not guilty of any fraud.

In addition, defendants assert that this Court has no jurisdiction with respect to the Tennessee corporations; that the assessments were untimely; that the assessments were made in violation of 26 U.S.C.A., § 7605(b); that two of the defendants are entitled to certain deductions under section 1311 et seq. of the Internal Revenue Code; and that the Commissioner of Internal Revenue erred in his determinations of overall taxable income and tax liabilities of the respective defendants. Defendants contend still further that they are entitled to certain deductions under the so-called *Cohan* rule enunciated by the Court of Appeals for

the Second Circuit in Cohan v. Commissioner of Internal Revenue, 2 Cir., 39 F.2d 540.

■ There are certain other issues between the parties which the Court has not yet mentioned, and the ultimate conclusion to which the Court has come in the case renders it unnecessary to discuss all of the issues tendered by the pleadings and the briefs. In this connection it is well established that the income tax laws are to be construed and applied in a practical manner; and it is obvious that in a case as complicated as this one, involving as it does numerous taxpayers, four tax years, and transactions running into millions of dollars, it is impossible for this Court or any other court to determine with either legal or mathematical exactness the tax liabilities of the respective defendants. The most that the Court can do is to try to reach a substantially accurate and legitimate result within the framework of the law and upon the evidence before the Court.

## I.

■ The argument that the Court does not have jurisdiction with respect to the Tennessee corporations does not merit prolonged discussion. When this suit was filed, those corporations were in the process of liquidation, and their trustee in liquidation was a citizen of Arkansas. The Tennessee offices of the building corporations had been closed, and the books, records, and remaining assets, if any, of those corporations were located in Arkansas. The Court is not called upon in this action to foreclose any liens on any property located in Tennessee.

## II.

Defendants' argument based on section 7605(b) of the Internal Revenue Code of 1954 is likewise rejected. That section provides that no taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year "unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

There is no question that the assessments with which the Court is concerned were not based upon the original inspections of the taxpayers' books and records made by the Internal Revenue Service. They were based on a second examination or upon a series of examinations subsequent to the initial inspections.

Defendants contend that the later examination or examinations were not made at their request and that they were not notified in advance that further examinations were necessary. The argument is that the failure to give advance notice of the necessity of further examinations vitiates the assessments.

Assuming without deciding that a failure of the Commissioner or his agents to comply with the notice requirements of section 7605(b) vitiates an assessment made on the basis of a second audit of the taxpayer's books, cf. Reineman v. United States, 7 Cir., 301 F.2d 267, the Court thinks that there are two answers to the defendants' argument based on that section.

■ First, there is no evidence that proper notice of the second or subsequent examinations was not given.[1] It is inconceivable that the Government agents were unfamiliar with section 7605(b), and there is a strong presumption that they acted in accordance with the law.

Second, there is nothing to indicate that any of the taxpayers objected to the later examination of the books and records, and the Court finds itself in agreement with counsel for the Government that the question was not properly raised in the pleadings or in the course of the trial; it came to the Court's attention for the first time when it was raised in defendants' post-trial brief. In the circumstances the failure to give the statu-

[1]. In the Government's brief it is stated that proper notices were given, and the Government offers to make proof to that effect. The Court thinks that such proof is unnecessary.

tory notice, if there was such a failure, was waived by the defendants. Lessman v. Commissioner of Internal Revenue, 8 Cir., 327 F.2d 990; United States v. O'Connor, 2 Cir., 237 F.2d 466. If the Court thought otherwise, it would permit the record to be reopened even at this late date.

### III.

Approaching the substance of the controversy between the parties, it is necessary to notice first the trial strategy which the Government advisedly adopted.

On the issue of fraud the Government assumed the burden of proving fraud by clear, cogent, and convincing testimony, and it introduced evidence in support of its charges of fraud. On the issue of the defendants' true taxable income and tax liabilities, however, the Government elected to rely solely upon the determinations and assessments of the Commissioner.

To make this clear the Court will repeat that the Government now contends that the true taxable income of the defendants was $7,498,125.56 of which $6,680,660.41 was under reported, and that of the total under reported income $3,503,922.27 was fraudulent. The Government introduced evidence for the purpose of showing that the sum last mentioned was fraudulently under reported, and thus necessarily introduced evidence to show that the fraudulently under reported or unreported income was in fact income. But, the Government never made an effort to prove, aside from the assessments, that the total under reporting was $6,680,660.41 or that the true taxable income of the defendants was $7,498,125.56 or any other particular sum.

In this connection the record reflects that in the course of the trial counsel for defendants asked counsel for the Government whether the latter was going to undertake to prove true income and called attention to the fact that the Internal Revenue Agent in charge of the case was present in the courtroom. Counsel for the Government replied that it did not intend to make such proof, and that if defendants wanted to call the Agent, they could do so. The Agent was not called.

■■ There can be no question that in a suit of this kind which has for its objects the collection of taxes due and the foreclosure of tax liens the Government has the burden of persuasion. However, when the Government shows that an assessment has been made and has not been paid, it makes out a prima facie case, and the taxpayer must go forward with the evidence, and must produce evidence sufficient to overcome the presumption in favor of the Commissioner's determination. When, however, the taxpayer meets that burden, the presumption in favor of the validity of the assessment passes out of the case, and the burden then devolves upon the Government to show the true amount of tax due. See 9 Merten's Law of Federal Income Taxation, Revised, § 49.218; Weir v. Commissioner of Internal Revenue, 6 Cir., 283 F.2d 675; Arkansas-Missouri Power Corporation v. Paschal, 8 Cir., 243 F.2d 584; Marcella v. Commissioner of Internal Revenue, 8 Cir., 222 F.2d 878; Paschal v. Blieden, 8 Cir., 127 F.2d 398; Cullers v. Commissioner of Internal Revenue, 8 Cir., 237 F.2d 611; Wiget v. Becker, 8 Cir., 84 F.2d 706.[2] And the taxpayer has met the burden of going for-

2. The rule above stated is that applied in proceedings before the Tax Court, and the Court thinks that the same rule should be applied in this case which is a plenary suit by the Government to establish tax liabilities and to foreclose tax liens. The rule is different in a suit by a taxpayer for a refund. In such a case he must show not only that the Commissioner has made an erroneous determination; he must go further and establish his own true income and tax liability. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Halvering v. Independent Life Insurance Co., 292 U.S. 371, 54 S.Ct. 758, 78 L.Ed. 1311; Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991; Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385; United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347.

ward when he introduces substantial evidence that the overall assessment of the Commissioner is wrong. Cullers v. Commissioner of Internal Revenue, supra; Wiget v. Becker, supra; Arkhola Sand and Gravel Co. v. United States, W.D. Ark., 190 F.Supp. 29.

Here, the Government introduced in evidence the assessments on which it relies, put on its fraud case, and rested. Defendants then called to the stand as an expert witness an accountant who testified with reference to certain exhibits. That witness undertook to demonstrate that the defendants were not guilty of fraud, that their tax obligations were much less than those asserted by the Government, and that some of the defendants were, indeed, entitled to refunds.

Defendants argue that the testimony and exhibits just mentioned were sufficient not only to destroy the prima facie correctness of the assessments but also to destroy the Government's fraud case, and that the Government's whole case must fall except to the limited extent that defendants are prepared to concede some liability.

The Government argues, on the other hand, that defendants' witness was not even a qualified expert; that his testimony was inadmissible; that defendants' exhibits were inadmissible; and that even if his testimony and the exhibits were admissible, they did not prove anything. On these premises the Government argues that it has proved fraud by direct evidence, and that the dollars and cents correctness of the assessments must be taken as established.

The Court does not agree with either of those extreme positions.

While the Government's contentions relative to the qualifications of defendants' expert and its objections to defendants' exhibits are not without force, the Court holds that the Government's objections go more to the weight to be given to defendants' evidence than to its admissibility.

■ The Court is by no means able to agree with the conclusions arrived at by defendants' expert, but, on the other hand, the Court cannot say that defendants' evidence is insubstantial. And, when that evidence is considered in the light of the concessions which the Government itself has been required to make and in the light of the very nature of this case, the Court is persuaded that defendants' evidence was sufficient to overcome the presumption of the correctness of the assessments upon which the Government relies.

It accordingly follows that the Government has not made a case except to the extent that it may have proved the existence and amounts of unreported income in connection with its fraud claims, a question presently to be considered.

That this conclusion reduces the magnitude of the case very substantially is obvious since we are now dealing not with nearly $7,000,000 of unreported income but only with about $3,500,000 of allegedly fraudulently unreported income. This conclusion also eliminates numerous claims for deductions, including claims advanced under the *Cohan* rule.

The Government concedes that there was no fraudulent under reporting of income by R. M. Supply Co., Evans & Evans, Gaylord Co., Williams Investment Co., Continental Co., or Yow Co., Inc., and the case against those defendants will be dismissed entirely. It is further conceded that there was no fraudulent under reporting with respect to McAdams Co. for the fiscal years ending July 31, 1953 and 1954; with respect to Southern Housing Co. for the fiscal years ending September 30, 1953 and 1954; with respect to Joel Construction Co. for the fiscal year ending January 31, 1955; with respect to Frayser Co., Inc. for the fiscal year ending August 31, 1954; with respect to Norfolk Company, Inc. for the fiscal year ending June 30, 1954; with respect to Continental Investment Co. for the calendar year 1954; or with respect to Mason Co., Inc. for the fiscal year

ending August 31, 1953. The case will be dismissed as to those particular defendants with respect to those particular tax years.

### IV.

■ On the fraud issue the burden is upon the Government to establish by clear and convincing evidence that during the years in question there were in fact understatements of taxable income, and that such understatements were made knowingly and with the unlawful intent to evade or defeat federal income tax liability. However, the Government is not required to prove fraud by direct evidence; it may rely on circumstantial evidence, including consistent under reporting of income, falsification of records, and similar conduct.

The problem is complicated to some extent by the fact that the Floridas elected to carry on their affairs by means of closely held corporations, with some corporations performing certain functions, and other corporations performing other functions, all having the ultimate end in view of making money for A. J. and G. H. Florida. A further complicating feature is the fact that the building corporations were set up purely for convenience and to enable the Florida building enterprise to conform to FHA restrictions with regard to maximum commitments to any one building corporation. While the building corporations had some paid-in capital contributed by other Florida corporations, the building corporations had no real control over their own affairs; they had no money and never received in money any compensation for the houses they built and which were subsequently sold. Consequently, their incomes during the years in question amounted to no more than credits in their favor on the books of other Florida corporations which handled the actual sales of the houses, collected the down payments made by purchasers and held the notes and mortgages executed by purchasers to evidence and secure the unpaid portions of the purchase prices of the houses.

In view of the situation just outlined the Court suggested from time to time in the course of the proceedings that corporate entities be ignored, at least as far as some of the corporations, including the building corporations, were concerned. Although the Government had alleged originally in connection with its application for a receiver that certain of the corporations were shams and merely the alter egos of the Florida brothers, by trial time counsel for the Government were insistent that corporate entities be recognized throughout. The defendants originally were of the view that corporate entities should be recognized but later changed their minds. The Court finally determined that corporate entities must be recognized, and they will be so recognized.

It is the theory of the Government that during the relevant years certain of the Florida corporations received income which they did not report for tax purposes. It is also contended that during those years certain corporations expended corporate funds for the personal benefit of the Florida brothers and either wrongfully deducted those expenditures as business expenses or so handled them on the books of the corporation as to conceal the fact that the moneys had been paid to the Floridas or for their benefit.

The Government also contends that during the years in question A. J. Florida and G. H. Florida received directly and indirectly large sums of money from certain of their corporations, which sums amounted to taxable income, and which sums the Florida brothers failed to include in their income tax returns.

As has been indicated, all of the defendants deny that they acted with fraudulent intent, and, in addition, it is contended on behalf of the Florida brothers that the money which they received, whether directly or indirectly, was not taxable income so that their failure to report it was not fraudulent or unlawful, regardless of their subjective intents.

There is no question that during 1951, 1952, 1953, and 1954 certain of the Florida corporations received income which they did not report for tax purposes, and that certain of the corporations expended corporate funds with the benefits of the expenditures inuring to the Florida brothers. As contended by the Government, some of those expenditures were falsely shown on the corporate books as deductible business expenses, and others were shown on the corporate books as receivables from the Floridas or as items of other types.

The Government's figures, as of the time of trial, with respect to the individual under reporting of the Florida brothers appear in Government Exhibit 571, a summary exhibit based on underlying evidentiary material. The Government's fraud figures with respect to the corporations are set forth in Government Exhibit 586, which is likewise a summary exhibit based on underlying evidence of record. Allegedly fraudulent deductions shown on Government Exhibit 586 appear as allegedly fraudulently unreported income to the Florida brothers on Government Exhibit 571.

The alleged under reporting of income, both individual and corporate, occurred in quite a number of areas which the Court finds it unnecessary to set forth or discuss in detail.

Generally speaking, certain of the building corporations overstated their costs of land acquisition; failed to show receipt of "closing costs" of housing sales as income while deducting them as expenses; paid personal expenses of the Florida brothers, either deducting them as corporate business expenses or handling them on the books in such manner as to conceal their true nature; and made certain minor payments for the benefit of Jackson Life Insurance Co., a Florida controlled enterprise. The other corporations made large payments for the benefit of the Florida brothers and large contributions to Jackson Life Insurance Co. In addition, Continental Mortgage Co. received several thousand dollars of income which it did not report. Further

the intercompany books were not in balance with each other. Adjustments were made by the Revenue Agents which resulted in some corporations being charged with additional income and in other corporations being charged with less income than shown on their books. The net effect of those adjusting entries was to increase overall corporate income by more than $100,000. The total corporate under reporting shown on Government Exhibit 586 was $1,232,315.82.

Government Exhibit 571 shows ten categories of unreported income of the Floridas individually. Again speaking generally, it appears that personal and living expenses of the Florida brothers were paid by certain corporations; that corporate moneys were paid to stock and commodity brokers for the benefit of the Floridas; that certain income of FREL was diverted to A. J. Florida; that large payments were made to or for the benefit of Jackson Life Insurance Co.; that corporate funds were paid over to the partnership of A. J. and G. H. Florida; that corporate funds were used to make payments on the "Driver Farm" which the partnership was acquiring; and that funds were withdrawn from certain controlled corporations and used to set up some of the building corporations in Tennessee.

The contention of the Government, expressed on page 38 of its brief, is that over the four "fraud years" A. J. Florida received $1,320,241.83 as personal income which he did not report, and that G. H. Florida over the same period of time received $951,354.42 which he did not report. It is understood, of course, that those are the amounts of personal income of the Floridas which the Government says are fraudulently omitted from their tax returns.

The final figures of the Government, after all credits and concessions, broken down among the defendants and allocated to the respective tax years 1951, 1952, 1953, and 1954, appear in a tabulation appearing at pages 13–15 of the Government's brief. Insofar as here relevant that tabulation is as follows:

| Taxpayer | Taxable Year | Fraudulently Unreported Income |
|---|---|---|
| Andrew J. and Lennie W. Florida | 1951 | $ 335,566.93 |
| | 1952 | 361,805.31 |
| | 1953 | 457,524.57 |
| | 1954 | 165,345.22 |
| George H. and Lillian B. Florida | 1951 | 155,771.36 |
| | 1952 | 197,722.47 |
| | 1953 | 381,738.09 |
| | 1954 | 216,122.50 |
| McAdams Company, Inc. | FYE 7–31–52 | 39,942.80 |
| Norfolk Company, Inc. | FYE 6–30–53 | 58,148.62 |
| Southern Housing Company | FYE 9–30–51 | 80,203.11 |
| | FYE 9–30–52 | 153,764.16 |
| Joel Construction Company | FYE 1–31–54 | 15,815.46 |
| Frayser Company, Inc. | FYE 8–31–53 | 10,015.89 |
| Florida Real Estate Loan | 1951 | 9,598.54 |
| | 1952 | 13,219.92 |
| | 1953 | 43,026.40 |
| | 1954 | 23,074.83 |
| Continental Investment Company | 1952 | 3,664.45 |
| | 1953 | 7,418.31 |
| Continental Land Company | 1951 | 1,568.53 |
| | 1952 | 2,611.92 |
| | 1953 | 161,619.12 |
| | 1954 | 92,108.07 |
| Mason Company, Inc. | FYE 8–31–51 | 60,354.01 |
| | FYE 8–31–52 | 197,229.17 |
| Speck Company, Inc. | FYE 9–30–52 | 9,110.43 |
| | FYE 9–30–53 | 26,369.18 |
| Wells Stations Company, Inc. | FYE 1–31–53 | 24,459.12 |
| | FYE 1–31–54 | 86,602.61 |
| Acme Insurance Agency, Inc. | FYE 4–30–51 | 496.50 |
| | FYE 4–30–52 | 545.00 |
| | FYE 4–30–53 | 6,778.21 |
| | FYE 4–30–54 | 28,560.09 |
| Continental Mortgage Company | FYE 7–31–51 | 17,777.25 |
| | FYE 7–31–52 | 33,020.66 |
| | FYE 7–31–53 | 9,221.05 |
| | FYE 7–31–54 | 15,992.41 |

The Court finds that as far as dollars and cents are concerned the figures appearing in the foregoing tabulations are substantially correct, and the Court accepts them as accurate dollars and cents figures.

■ The Court also finds from the evidence, which the Court considers to possess the requisite certainty and probative force, that the under reportings disclosed by the Government's proof were fraudulent and were made with the intent to evade and defeat federal income tax liability.

The under reportings were consistent over the four year period involved and represented vast sums of money. They could hardly have been due to mere inadvertence, accident, or negligence. The corporate books were falsified, and the true nature of relevant transactions was concealed. It is obvious to the Court that the practices followed within the Florida organization whereby the records of the Florida operations were thrown into a hopeless state of confusion were followed for the specific purpose of evading taxes; indeed, they could have served no other useful purpose.

It is necessary next to consider whether the unreported items reflected on Government Exhibit 571 and Government Exhibit 586 were in fact items of taxable income. If they were, liability, including liability for fraud penalties, exists with respect to them; if they were not, there is no liability regardless of the intents and motives of the taxpayers.

■ The Court has no difficulty in finding, and does find, that the items appearing on Government Exhibit 586, except the items representing personal and living expenses of the Florida brothers paid by the building corporations, represent items of unreported corporate income and are taxable to the corporations as ordinary corporate income.

The personal and living expenses mentioned in the preceding paragraph were paid by cash disbursements of the building corporations. It does not appear to the Court, however, that the cash in question came out of the income of those corporations or represents any understatement of income. The cash was supplied by other corporations and was never properly chargeable to the building corporations as income.

The payments of expenses of A. J. Florida by the building corporations over the four year period total $6,783.13, and the payments of expenses of G. H. Florida by the same corporations over the same period amount to $9,701.10. The expenses of both of the brothers paid by the building corporations aggregate $16,-484.23; and the action which the Court is taking with respect to those items will reduce the corporate under reporting from the $1,232,315.82, shown on Government Exhibit 586, to $1,215,831.59.

Turning now to the under reporting of the Florida brothers individually shown on Government Exhibit 571, the Government says in its principal brief that the under reportings now in question were not assessed to the Florida brothers as constructive corporate dividends, but simply as money which the Floridas diverted or caused to be diverted from their corporations, which money the Floridas received, directly or indirectly, and which was subject to their complete control and domination. On that premise the Government assessed the receipts as ordinary individual income.

That approach seems to have been in line with a policy which the Commissioner had adopted about the time the assessments here in question were made. However, in late 1957 the Court of Appeals for this Circuit in Simon v. Commissioner of Internal Revenue, 8 Cir., 248 F.2d 869, held that where a stockholder diverts corporate funds to his own use, and where the Commissioner later assesses those funds against the corporation as corporate income, he may not assess the same funds against the stockholder as ordinary individual income, but must, as against the individual, treat his receipt of funds as a corporate distribution. See also Dawkins v. Commissioner of Internal Revenue, 8 Cir., 238 F.2d 174. It was

noted in *Simon* that the policy of the Commissioner in assessing the same money twice, once to the corporation as corporate income and again to the individual recipient of the funds as ordinary individual income, represented an illegal and unjustified departure from former Treasury policy.

Normally, a corporate distribution is either a dividend or a return of capital or both. With certain exceptions and qualifications dividends received by a corporate stockholder are taxable to him as ordinary income, whereas a return of capital has no tax consequence unless it results in a capital gain or loss.

Section 316(a) of Title 26, U.S.C.A., provides in substance that a "dividend" means any distribution of property made by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913, or "out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made." That section further provides that in general every distribution "is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits."

The Florida brothers contend that the Commissioner was required to treat their receipts of corporate funds as corporate distributions, and that when such is done, it will turn out that most, if not all, of the moneys paid to the Floridas or for their benefit were actually returns of capital and not dividends. The Floridas also argue that many of the expenditures for their benefit were actually loans or advances and were neither dividends nor returns of capital.

The Court rejects out of hand the argument that some of the moneys received by the Floridas were loans. It is quite true that some of the payments to or for the brothers were made to appear as loans or advances, but the Court is convinced that it was never intended for any of those so-called loans or advances to be repaid, and that this bookkeeping treatment of the transactions was nothing more than a part of the overall fraudulent scheme.

With regard to the assessments of the payments to the Florida brothers as ordinary income, the Government argues that its action was proper and cites in that connection Weir v. Commissioner of Internal Revenue, 6 Cir., 283 F.2d 675. The opinion in *Weir* does not indicate that there the Commissioner was trying to assess the same money as ordinary income to both the corporation and the stockholder, and the case is probably distinguishable on that basis. But, however that may be, this Court will follow the ruling of the Court of Appeals for this Circuit in *Simon*, supra.

It is obvious that in many instances the treatment of receipt of corporate funds received by a stockholder as a corporate distribution rather than as ordinary income to the taxpayer can have a profound effect on his tax liability. Here, however, the Court is persuaded that it makes no real difference which approach is taken, and that the Commissioner reached the correct end result, albeit on the wrong theory. The Court finds in this connection that the moneys paid out and other transfers by the corporations to the Floridas or for their benefit were constructive dividends and are taxable to the Floridas as ordinary dividend income.

It is impossible for the Court from the record before it to determine with any degree of accuracy the financial conditions of the respective Florida corporations at any particular time. That is due in large measure, if not entirely, to the condition of the Florida books and records and is the fault of the Floridas and their agents and employees. That condition of the books and records is not the result of honest bookkeeping errors and mistakes; it was the result of the fraudulent scheme to evade taxes, a scheme which itself presupposes that the Florida corporations were earning profits the taxes on which it was the purpose

of the scheme to evade. Absent earnings and profits during the "fraud years" there would have been no occasion to falsify the books or to make surreptitious payments to and for the Florida brothers. Certainly there would have been no reason for such conduct if the payments were or were intended to be ordinary and legitimate returns of capital investments.

Under section 316 dividends may be paid out of accumulated earnings and profits; they may be paid also out of current earnings and profits, and distributions are deemed to be out of earnings and profits to the extent thereof and out of the most recently accumulated earnings and profits.

It is clear that the Florida organization was making money during 1951, 1952, 1953, and 1954, and with the record showing as it does the large payments flowing to the personal benefit of the Floridas, and the accompanying efforts to conceal the existence of that flow, the Court thinks it permissible to infer, and does infer, that the funds transferred represented current earnings and profits of the respective corporations.

Even if the Court felt that some of the distributions to the Floridas should be treated as returns of capital, it is by no means clear how much they would be helped thereby. This is true because to the extent that the distributions were held to be returns of capital the Florida brothers might well be held to transferee liability with respect to the corporate taxes.

The Government urges that in any event this is a proper case for the imposition of transferee liability. The Court does not agree, and no transferee liability will be imposed on any defendant. The Court has adopted the Government's characterization of the several flows of funds and property as flows of income, and in the Court's eyes it would be inconsistent to hold the recipients liable for the taxes of the transferors. Each defendant will be charged with his or its own liability and not with the liability of any other defendant or defendants.

## V.

On the main case the ultimate conclusion of the Court is that A. J. Florida and G. H. Florida and the corporations named in Government Exhibit 586, namely: Frayser Co., Inc., Joel Construction Co., Inc., Mason Co., Inc., McAdams Company, Inc., Norfolk Co., Inc., Southern Housing Company, Speck Company, Inc., Wells Station Co., Inc., Continental Investment Co., Continental Land Co., Continental Mortgage Co., Florida Real Estate Loan Co., and Continental Insurance Agency, Inc. (Acme Insurance Agency, Inc.), are liable to the Government for additional income taxes and fraud penalties, plus interest. The basis of the liability of each of those defendants will be the amount of his or its fraudulently unreported income for each tax year involved plus such income, if any, as he or it may have previously reported.

The amounts of fraudulently unreported income of the respective defendants for the respective years involved are those set forth in the tabulation appearing earlier in this opinion, except that there is to be deleted from the fraudulently unreported income of the building corporations the amounts spent by those corporations respectively for the personal and living expenses of the individual Florida brothers.

The Court is not in any position at this time to determine the dollars and cents liability of any defendant. Those amounts will have to be computed by the Department of Justice and the Internal Revenue Service in the light of the findings and conclusions of the Court expressed in this opinion. The Court is now calling upon the Government to make those computations without prejudice to its position that it is entitled to judgment in accordance with the entire assessments made by the Commissioner and not merely with respect to fraudulently unreported income.

## VI.

Counsel for the Government will prepare and submit a precedent for a decree in accordance with the foregoing after first seeking to secure the approval of counsel for the defendants as to form and computations. The decree should provide not only for judgments against the Florida brothers and their corporations but also for the foreclosure of the Government's tax liens, the sale of the properties covered by those liens, the payment of claims superior to those of the Government, and the winding up of the receivership.